DA 10-0382

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 151

---

MONTANA TROUT UNLIMITED,

      Objector and Appellant,

  v.

BEAVERHEAD WATER COMPANY, GARRISON RANCHES, INC.,
PAUL H. CLEARY, JR. TRUST, MONTANA BOARD OF LAND
COMMISSIONERS, HAIRPIN LC, SPENCO LLC,

      Claimants and Appellees.

APPEAL FROM:    Water Court of the State of Montana
                     Cause No. Case No. 41D-1; Honorable C. Bruce Loble, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Laura S. Ziemer, Patrick Byorth (argued) (attorneys), E. Rebecca Gantt,
            (law student intern); Montana Trout Unlimited, Bozeman, Montana

      For Appellees:

            John E. Bloomquist (argued), Patti L. Rowland, Abigail J. St. Lawrence;
            Doney Crowley Bloomquist Payne Uda P.C., Helena, Montana
            (for Appellees Beaverhead Water Company; Garrison Ranches, Inc.;
            and Paul H. Cleary, Jr. Trust)

            Holly Jo Franz (argued); Franz & Driscoll, PLLP, Helena, Montana
            (for Appellees Hairpin LC and Spenco LLC)

      For Amicus Curie:

William A. Schenk (argued), Agency Legal Counsel, Special Assistant Attorney General, Montana Department of Fish, Wildlife and Parks, Helena, Montana (in support of Appellant Montana Trout Unlimited)

Orally argued and submitted: February 2, 2011
Decided: June 23, 2011

Filed:

_____
Clerk

2

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Montana Trout Unlimited (MTU) appeals from the Water Court's order filed June 4, 2010, dismissing its objections to water right claims by Beaverhead Water Company, Garrison Ranches and the Paul H. Cleary, Jr. Trust (Claimants). Those claims were contained in the Water Court's Temporary Preliminary Decree for the Big Hole River Basin issued on April 6, 2007. We reverse.

## BACKGROUND

¶2 Pursuant to Article IX, Section 3(4) of the Montana Constitution, Montana law provides for an orderly process for adjudicating existing water rights. *See generally* Title 85, Chapter 2, MCA. Persons who claim water rights that existed prior to July 1, 1973, were required to file statements of their claims, which are then compiled and examined by the Department of Natural Resources and Conservation under the direction of the Water Court. The Water Court then issues an interlocutory, temporary preliminary, or preliminary decree of water rights based on the claims, on data from the DNRC, on other information obtained by the water judge, and on water compacts where applicable. Public notice of the decree provides opportunity for interested persons to review and object to the decree for good cause. The Water Court holds hearings on the issues raised by the objections and issues a final decree. Rule 1(b), Water Right Adjudication Rules (W. R. Adj. R.); §§ 85-2-224 through -235, MCA.

¶3 On April 6, 2007, the Water Court issued a temporary preliminary decree in Basin 41D, the Big Hole River. Pursuant to notice of the decree, MTU filed timely objections to several of the claims of each of the Claimants and requested a hearing. The Claimants

3

moved to dismiss the MTU objections, arguing that MTU lacked standing to object. The Water Court converted the motions to dismiss to motions for summary judgment. MTU and Claimants waived their right to a hearing on summary judgment and stipulated that the Water Court could accept as true the assertions of fact made in their briefs and in the attachments to MTU's brief.

¶4 The Water Court determined that the motions involved only issues of law and ultimately granted summary judgment to the Claimants, holding that MTU lacked standing to file objections to the water right claims. In doing so the Water Court expressly incorporated its prior decision on similar standing issues issued in response to motions to dismiss objections filed by the Western Watersheds Project (Water Court Case No. 41D-2).

¶5 MTU is a membership conservation organization of anglers dedicated to the conservation, protection and restoration of coldwater fish, including wild and native trout in Montana. MTU has been actively involved in cooperative restoration efforts for arctic grayling and wild trout in the Big Hole River Basin and actively participates in the Big Hole Watershed Committee. MTU has contributed funding to support the implementation of a voluntary drought plan on the Big Hole which seeks to maintain minimum water flows without unduly restricting the interests of diversionary water users. MTU's efforts on the Big Hole have been directed at improving habitat for the grayling and wild trout, focusing on mitigating the impacts of low stream flows through water conservation and habitat and flow restoration. MTU asserts that unsupported large water right claims could unravel its years of fish restoration and protection on the river and negatively impact the instream water

4

reservations on the Big Hole River held by the Montana Department of Fish, Wildlife and Parks.

¶6     The Water Court acknowledged MTU's "historical contributions" in Montana's water adjudication efforts, noting its participation in litigation, the Water Right Adjudication Advisory Committee, legislative hearings, and the Water Court's rule-making proceedings. The Water Court concluded that MTU "contributed much to the outcomes."

¶7     The Water Court decided the motions to dismiss MTU's objections by first applying § 85-2-233, MCA, which provides:

> (1)(a)  For good cause shown . . . a hearing must be held before the water judge on any objection to a temporary preliminary or preliminary decree by:
> (i) the department [of Natural Resources and Conservation];
> (ii) a person named in the temporary preliminary decree or preliminary decree;
> (iii) any person within the basin entitled to receive notice under 85-2-232(1); or
> (iv) any other person who claims rights to the use of water from sources in other basins that are hydrologically connected to the sources within the decreed basin and who would be entitled to receive notice under 85-2-232 if the claim or claims were from sources within the decreed basin.
> (b)  For the purposes of this subsection (1), "good cause shown" means a written statement showing that a person has an ownership interest in water or its use that has been affected by the decree.

The Water Court held that while MTU was a person entitled to receive notice of the decree, it must also demonstrate "good cause" by showing "an ownership interest in water or its use that has been affected by the decree" when filing objections.

¶8     MTU filed a "statement of interest" to meet the "good cause" requirement.  It recited MTU's participation in the Big Hole River fish and water flow protection and restoration efforts, its interest in promoting and protecting those efforts by insuring that water right

5

claims are thoroughly examined and well supported, its interest in fulfilling the instream water reservations of the Department of Fish, Wildlife and Parks, and its goal of insuring that its members could continue to fish the river. The Water Court acknowledged that it is "beyond dispute that *all* citizens of Montana have public environmental and recreational interests in the natural waters of Montana." (Emphasis in original.)

¶9 The Water Court held:

> For purposes of the Claimants' motions for summary judgment, the Court will assume that TU's statement of interest and the affidavits of its members sufficiently allege *personal* environmental and recreational interests of the members in the Big Hole River basin, distinct from the public at large, that arguably could be adversely affected by the temporary preliminary decree in the Big Hole River basin.
> Under the broad standing requirements of the Montana Administrative Procedures Act and even broader standing requirements of most federal and Montana environmental protection statutes, such interests may be sufficient for persons to establish either constitutional or statutory standing to challenge the *constitutionality* of governmental acts or agency decisions.
> However, personal environmental and recreational interests in the water, alone, are not sufficient to establish the "personal stake" required for standing to be heard on objections to claims in the present adjudication of existing water rights, unless those interests are *coupled with* an "*ownership interest in water or its use . . . .*" [Emphasis in original.]

The Water Court determined that the amendments to § 85-2-233, MCA, "over time" demonstrate legislative intent to narrow the scope of objections entitled to be heard to those that are coupled with an ownership interest in water or its use.

¶10 The Water Court observed that there was no evidence that MTU or any of its members had filed any water right claims in the adjudication process or that they had applied for post-July 1, 1973 certificates or permits to use water. Further, the court determined that under Montana law, only the DNRC and the DFWP are authorized to "represent the public in

6

the adjudication process." *See* §§ 85-1-101, -204, and -223, MCA, and *In the Matter of the Missouri River Drainage Area*, 2002 MT 216, ¶ 1, 311 Mont. 327, 55 P.3d 396 (*Bean Lake III*). The Water Court concluded that MTU's interests in the Big Hole River are related to citizen interests "claimed and reserved by the DNRC and DFWP" and further that the

> Legislature and the Supreme Court have resolved the public policy and legal debate on who represents the public in the adjudication process. As a result, TU does not have standing to champion the public interests either through the filing of claims or through the filing of objections to claims.

MTU, therefore, was precluded from filing water claims for public recreational or wildlife purposes, from filing objections to claims or from requesting hearings on objections to claims.

¶11 Last, the Water Court considered MTU's contention that, in the alternative, it had a "legitimate role to play" in the Big Hole adjudication to insure that DNRC issue remarks were properly resolved. Issue remarks are statements by the DNRC added to its abstracts of water right to "identify potential factual or legal issues" associated with the claims. Section 85-2-250, MCA. Because the State of Montana owns all water in the state under Article IX, Sec. 3 of the Constitution, the Legislature has established the policy to ensure that valid issues raised during claims examinations are resolved before final decrees are issued. Section 85-2-247, MCA. All DNRC issue remarks that are not resolved through the objection process must be resolved by the Water Court. Section 85-2-247, MCA.

¶12 The Water Court again recognized the role that MTU has played in the water adjudication process generally and in the habitat restoration and water administration efforts on the Big Hole River in particular. However, the Water Court concluded since MTU's

7

interests "are not coupled with an enforceable ownership interest in the water or its use" acquired under Montana law, its role lies not in filing objections but in "the myriad other opportunities and programs established by state law that invite and encourage the kind of interests, dedication, and expertise evidenced by TU in this case."

¶13   MTU raises issues on appeal that we restate as follows:

¶14   Issue 1.  Whether the Water Court erred in holding that only the DFWP may represent public recreational and conservation interests in water adjudication proceedings.

¶15   Issue 2.  Whether the Water Court erred in holding that only water right claimants may request a hearing on their objections in water adjudication proceedings.

## STANDARDS OF REVIEW

¶16   The Water Court decided this case on summary judgment after determining that there were no material facts in dispute and only issues of law.  This Court applies the same standards of review to the Water Court as it does to an appeal from a district court. *Department of State Lands v. Pettibone*, 216 Mont. 361, 368, 702 P.2d 948, 952 (1985). This Court reviews a lower court's conclusions of law concerning the construction of a statute de novo, to determine whether they are correct.  *Hulstine v. Lennox Ind. Inc.*, 2010 MT 180, ¶ 16, 357 Mont. 228, 237 P.3d 1277.

## DISCUSSION

¶17   **Issue 1.  Whether the Water Court erred in holding that only the DFWP may represent the public recreational and conservation interests in water adjudication proceedings.**

¶18    The Water Court noted that at least one of the goals of MTU's objections to the Claimants' statements of claim was to insure that water would be available in the Big Hole River for fish habitat, and to fulfill the in-stream water reservation claim by the DFWP. In light of this purpose, the Water Court relied upon § 85-2-223, MCA, which provides in part that the DFWP "shall exclusively represent the public for purposes of establishing any prior and existing public recreational use in existing [water] right determinations." The Water Court relied upon this statute, coupled with the statement in *Bean Lake III* that "[o]nly DFWP can represent citizen interests in the adjudication process" (*Bean Lake III*, ¶ 1), to conclude that "TU does not have standing to champion the public interests either through the filing of claims or through the filing of objections to claims."

¶19    This is an erroneously broad application of § 85-2-223, MCA. On its face the statute assigns an exclusive role to DFWP only in the context of "*establishing* any prior and existing public recreational use in existing [water] right determinations." (Emphasis added.) Here MTU is not seeking to establish any public recreational right to the use of water in the Big Hole River. To the contrary, the Water Court made it clear that MTU has not made any water right claims in the Big Hole River adjudication process. Section 85-2-223, MCA, does not prohibit an entity other than DFWP from filing an objection with the goal of generally enhancing the amount of water available for fish habitat or recreational use, or for fulfilling in-stream water reservations already claimed by DFWP.

¶20    Further, the statement in *Bean Lake III*, in the context of that case, does not support an expansive reading of § 85-2-223, MCA, that is broader than the statute's plain words. *Bean Lake III* involved the validity of claims by DFWP in the water adjudication process to the

9

waters of Bean Lake for public fish, wildlife and recreational uses. In that context, and as provided in § 85-2-223, MCA, only DFWP can represent the public interest in propounding such claims. The language in *Bean Lake III*, ¶ 1, should not be given any broader meaning.

¶21 In addition, the Water Court held that § 85-2-223, MCA, precluded MTU from even filing objections in the water adjudication process. There is no limitation in the water right adjudication statutes, in the water right adjudication rules, or in case law that expressly limits who can file an objection to a temporary preliminary decree. Section 85-2-232, MCA, requires the Water Court to provide wide public notice when it issues a temporary preliminary decree. Objections to claims contained in the decree must be filed within 180 days after entry of the decree, or within such additional time as the Water Court grants. Section 85-2-233(2), MCA. Objections must specify the findings and conclusions to which an objection is made, and must state the grounds and evidence relied upon. Section 85-2-233(4), MCA. At the close of the period for filing objections, the Water Court must notify each water right claimant whose claim received an objection and allow that claimant to file a counter-objection. Section 85-2-233(3), MCA.

¶22 When the time for filing objections and counter-objections has expired, the Water Court "shall fix a day when all parties who wish to participate in future proceedings are required to appear or file a statement. The water judge shall then set a date for a hearing." Section 85-2-233(5), MCA. Similarly the Water Right Adjudication Rules state that objections must comply with § 85-2-233, MCA, and must also designate the findings and conclusions with which the objector disagrees, the elements of the claim that the objector believes should be modified, and the grounds and evidence upon which the objection is

10

based. Rule 5(a), W. R. Adj. R. *Compare* § 85-2-308(3), MCA, describing persons who have "standing to file an objection" to an application for a post-July 1, 1973 water use permit.

¶23    In summary, there is no statutory or regulatory restriction on who is entitled to file an objection to a claim of water right contained in a temporary preliminary decree, and the Water Court's holding to the contrary was in error.

¶24    **Issue 2.  Whether the Water Court erred in holding that only water right claimants may request a hearing on their objections in water adjudication proceedings.**

¶25    The Water Court held that under § 85-2-233, MCA, only persons who previously claimed existing water rights were entitled to request hearings on objections in the water adjudication proceedings.  Since MTU did not claim any existing water right, the Water Court precluded it from obtaining a hearing on its objections.

¶26    Section 85-2-233, MCA, provides that "[f]or good cause shown" the Water Court must hold a hearing on objections to water right claims.  Good cause shown is defined to mean "a written statement that a person has an ownership interest in water or its use that has been affected by the decree."  Section 85-2-233(1)(b), MCA.  The Water Court construed the good cause requirement to mean ownership of a water right claim in the adjudication, and thereby disqualified MTU as a person entitled to a hearing.  In the context of the water adjudication proceedings, this is an erroneous construction of the good cause requirement.

¶27    While the Water Court dismissed MTU's objections under § 85-2-233, MCA, its discussion of the issue began with an acknowledgement of the established rules of standing applied by Montana courts.  The question of standing is whether a litigant is entitled to have

11

the court determine the merits of a particular dispute. *Gryczan v. State*, 283 Mont. 433, 442, 942 P.2d 112, 118 (1997). Standing resolves the issue of whether the litigant is a proper party to seek adjudication of a particular issue, not whether the issue is justiciable. *Helena Parents Comm. v. Lewis and Clark County*, 277 Mont. 367, 371, 922 P.2d 1140, 1142 (1996). The test of standing is that the complaining party must clearly allege past, present or threatened injury to a property or civil right, and the alleged injury must be distinguishable from the injury to the public generally, but it need not be exclusive to the complaining party. *Stewart v. Board of County Comm'rs*, 175 Mont. 197, 201, 573 P.2d 184, 186 (1977); *Aspen Trails Ranch v. Simmons*, 2010 MT 79, ¶ 37, 356 Mont. 41, 230 P.3d 808. This Court has upheld the standing of citizen organizations to challenge governmental actions. *MEIC v. DEQ*, 1999 MT 248, 296 Mont. 207, 988 P.2d 1236; *In the Matter of the Dearborn Drainage*, 234 Mont. 331, 766 P.2d 228 (1988) (*Bean Lake I*).

¶28 The Water Court applied the common law rules of standing and concluded that MTU had sufficiently alleged environmental and recreational interests of its members in the Big Hole River basin that were distinct from those of the public at large, and that could be adversely affected by the temporary preliminary decree. The Water Court held that this was sufficient only to allow MTU to challenge the constitutionality of governmental acts or agency decisions. It was not, however, sufficient to demonstrate a "personal stake" in the water adjudication process because MTU lacked ownership of a water right claim. We have found no support for this rule applied by the Water Court that a person or entity with standing under the common law rules noted above only has standing to challenge the constitutionality of a statute or governmental action. The cases cited by the Water Court in

12

support of this proposition contain no such holding. *See Clark Fort Coalition v. DEQ*, 2008 MT 407, 347 Mont. 197, 197 P.3d 482; *Bitterroot River Protective Association v. Bitterroot Conservation District*, 2008 MT 377, 346 Mont. 507, 198 P.3d 219; *Mont. Envir. Info. Center v. DEQ*, 1999 MT 248, 296 Mont. 207, 988 P.2d 1236.

¶29    All waters in Montana are the property of the State of Montana for the use of its people. Montana Constitution, Art. IX, Sec. 3. Under the Montana Constitution and the public trust doctrine, the public owns an instream, non-diversionary right to the recreational use of the State's navigable surface waters. *Bean Lake III*, ¶ 30. The State of Montana became trustee of the public trust over the navigable streambeds and the waters of this State upon achieving statehood, and the Constitution and public trust "do not permit a private party to interfere with the public's right to recreational use of the surface of the State's waters." *Montana Coalition for Stream Access v. Curran*, 210 Mont. 38, 52, 682 P.2d 163, 170 (1984).

¶30    The State holds title to the surface waters of Montana for the benefit of its citizens, including the Claimants and the members of MTU. This is reflected in Montana law. Montana Constitution, Art. IX, Sec. 3 (all waters within the state are the property of the state for the use of its people); § 75-5-303, MCA (existing water uses and the level of water quality necessary to protect those uses must be maintained and protected, including existing and anticipated uses); § 75-5-101, MCA (it is the public policy of the state to conserve water by protecting, maintaining and improving water quality for public water supplies, wildlife, fish, aquatic life, agriculture, industry, recreation and other beneficial uses); § 85-1-101, MCA (water resources must be protected and conserved to assure adequate supply for

13

recreation and for the conservation of wildlife and aquatic life); § 85-2-101, MCA (any use of water is a public use and the water within the state is the property of the state for the use of its people); § 85-2-223, MCA (DFWP must represent the public for purposes of establishing prior and existing public recreational right to use water); § 87-5-501, MCA (it is the policy of the state that its fishing waters are to be protected and preserved to the end that they will be available for all time); § 23-2-302, MCA (all surface waters capable of recreational use may be used by the public without regard of the ownership of the land underlying the waters).

¶31    This Court will harmonize statutes relating to the same subject in order to give effect to each. *State v. Brendal*, 2009 MT 236, ¶ 18, 351 Mont. 395, 213 P.3d 448. We also must view the statute within the context of the meaning and purpose of water rights adjudication in Montana. Section 85-2-101(1), MCA, establishes that "any use [of water] is a public use," supporting the "long-standing underlying policy . . . that water is a public resource that cannot be owned by the individual users." *See* Albert W. Stone, *Montana Water Law*, 70 (State Bar of Montana 1994). *See also Paradise Rainbow v. Fish and Game Commission*, 148 Mont. 412, 421 P.2d 717 (1966). "Ownership" is not defined within Title 85, but, as Stone explains, a water right "is 'usufructory,' i.e., it is a right to make a use of waters owned by the state—a water right confers no ownership in those waters." Stone continues:

> Terminology can affect how people think about the subject. The words "property right" draw to themselves and connote a bundle of old, sacred, absolute, and inviolate ideas of exclusivity, possession and permanence. Although these concepts are not alien to water law, they are not the language of water law . . . because water law does not deal with these things, but with uses, re-uses, sharing, and priorities rather than exclusivity, possession or even

14

permanence.

Stone at 73.

¶32 Since inception of the water rights adjudication process, the Legislature has acknowledged these concepts in the doctrine of exchange and efficient use requirements. Stone at 61, 71; *see also* §§ 85-2-114 and -413, MCA. Claimants contend that a claim for a water right is the only method of establishing an "ownership interest" in the use of water. However, Claimants' contention is inconsistent with the construction of a water right as a usufructory right, which does not confer any actual physical ownership.

¶33 A fundamental aspect of the present case is that the Water Court found that MTU, or more properly its members, had demonstrated personal environmental and recreational interests in the Big Hole River basin; that these interests were distinct from those of the public at large; and that these interests could be adversely affected by the temporary preliminary decree. This finding has not been challenged on appeal and, but for the Water Court's application of the "good cause" definition in § 85-2-233, MCA, MTU clearly has standing to litigate its objections in the Big Hole River basin water right adjudication. *MEIC v. DEQ*, ¶ 45. Thus, MTU has met the common law standing requirements by demonstrating a particularized interest in the adjudication of the Big Hole watershed; MTU complied with the statutory requirement of requesting notice of the preliminary decree; and MTU objected to specific claims in the basin because DNRC placed issue remarks on those claims indicating over-statement of historic irrigation uses. We will not interpret § 85-2-233, MCA, to deny a party's ability to be heard where that party has met all common law and statutory

15

requirements for standing to object to a preliminary decree and has shown that its interest in the use of water "has been affected by the decree."

¶34 We conclude, based upon the State's ownership of the waters of Montana which it holds in public trust for the benefit of its people, and the undisputed specific interests of the members of MTU in the Big Hole River basin that MTU--under the facts of this case--has a sufficient ownership interest in water or its use to demonstrate "good cause" to require the Water Court to hold a hearing or hearings on its objections under § 85-2-223, MCA.

¶35 Our interpretation of § 85-2-233, MCA, does not render the word "ownership" meaningless or expand the right to be heard on an objection to a preliminary decree to every person in the State of Montana. Rather, it is consistent with the statute as a whole and with the intent of the Legislature in developing a comprehensive water rights adjudication process.

¶36 The water right adjudication statutes begin with the broad requirement that all persons claiming water rights that arose before July 1, 1973, file notices of their claims. Section 85-2-212, MCA. The statutes direct the Water Court to consider "all relevant evidence in the determination and interpretation of existing water rights" and "any additional data" when compiling a temporary preliminary decree. Sections 85-2-227(2) and -231(2), MCA. The water judge must provide broad notice of a temporary preliminary decree. Section 85-2-232(1), MCA. As previously discussed, there are no stated limits on who can file objections to claims in temporary preliminary decrees, and hearings on those objections must be held upon a showing of good cause. Section 85-2-233, MCA. There are broad rights to appeal from decrees of the Water Court. Section 85-2-235, MCA.

¶37 The Water Right Adjudication Rules reflect the broad reach of the statutes. Rule 1(b), W. R. Adj. R., describes the adjudication process, including notices of decrees; the "opportunity for interested persons to review and object . . . for good cause;" hearings by the Water Court on "issues raised in these proceedings;" and "the opportunity for interested parties to review and appeal the final decree. . . . " Rule 5, W. R. Adj. R., specifies the content of objections and the time within which they must be filed, but does not otherwise restrict the persons who can file objections. Rule 9, W. R. Adj. R., requires the Water Court, after compilation of all objections to claims, to set the date when "persons other than the claimants, objectors, or counter-objectors to a particular claim shall file a notice of intent to appear . . . ." Rule 9(b), W. R. Adj. R., further describes these notices of intent to appear:

> Any person other than the claimant or objector who intends to appear and participate in further proceedings for any claims or issues included on the objection list must file a notice of intent to appear in compliance with § 85-2-233, MCA. . . . The person filing a notice of intent to appear shall specify the claim number and include a statement of the appearing person's legal rights that might be affected by the resolution of the objections or issues involving the specified claim, and the purposes for which further participation is sought. Persons who file notices of intent to appear as provided in this rule shall receive notice of all future proceedings involving the claims specified in their notice and are entitled to participate in the resolution of the issues associated with those claims.

It is incongruous, at least, to exclude MTU from substantively participating in the adjudication of the Big Hole River, but to allow any other person to file a notice of intent to appear and to participate without meeting the "good cause" requirement of § 85-2-233, MCA.

¶38 Prior decisions of the Water Court also reflect a broad approach to participation in the adjudication process. In its 2002 opinion approving the Chippewa Cree Tribe Water

17

Compact, 2002 ML 4232, Case No. WC 2000-01, the Water Court adopted an express "broad tent" policy with respect to considering objections to water compacts. As long as the objections are not arbitrary, irrational, unreasonable, or irrelevant then only a "minimal claim or interest in land or water that could feasibly be adversely affected" is sufficient to constitute "good cause." The Water Court allowed objectors to the compact to participate even though the remoteness of the potential harm stretched even the broad tent policy. The Water Court allowed participation by these objectors, however, because the objections should be considered "in the interest of resolving all potential disputes that could arise." While the Water Court in the present case distinguished the Chippewa Cree Water Compact case on the ground that each of the objectors there had some interest in land or water within one of the affected basins, the decision to allow broad participation was not based on that ground, but upon the desirability of allowing even remotely affected and interested persons the opportunity to participate. It is again incongruous to stretch an already broad tent to allow participation by objectors in that case and to deny it to MTU, with its demonstrated interest, in this case.

¶39 In the *Bean Lake* cases, which involved the issue of whether DFWP held a valid pre-1973 public recreational appropriation right for fish and wildlife, the Water Court recognized the importance of the issue, gave wide notice, and invited participation by interested persons who were "allowed the equivalent of objections." *Bean Lake I*, 234 Mont. at 334, 766 P.2d at 230. Over 50 individuals and organizations accepted the Water Court's invitation and objected to DFWP's claimed public recreational use right. When the DFWP contested the standing of the Montana Stockgrowers Association to object because there were only two

18

actual appropriators from the water source and neither was represented by the Association, the Water Court held that the Association had standing to proceed as a party on behalf of its members because they "could be affected" by the outcome of the case. *Bean Lake I*, 234 Mont at 336, 766 P.2d at 231.

¶40 The Water Court in a subsequent proceeding held that because of the significance of the issue of recreational water rights, the DFWP should be required to "bear all the costs" of the Stockgrowers Association's participation in the case. Shifting the burden of attorney fees was, in the view of the Water Court, necessary to "ensure full presentation of all public interests" and, without such funding, "certain viewpoints may not be presented and as a result the overall integrity and effectiveness of the adjudication process may be diminished." *Bean Lake II*, 240 Mont. at 41-42, 782 P.2d at 899 (wherein this Court reversed the award of attorney fees on the ground that the recreational use claim by DFWP, even though unsuccessful at that time, had been made in good faith and in accord with constitutional and statutory mandates). The Water Court's view of *Bean Lake* and the Stockgrowers, again, stands in contrast to the dismissal of MTU's participation in the Big Hole River adjudication in the present case.

¶41 Decisions from this Court are similarly reflective of the importance of broad rather than narrow rights of participation in water adjudications. In *In the Matter of Adjudication of Rights in the Yellowstone River*, 253 Mont. 167, 832 P.2d 1210 (1992), which dealt primarily with the issue of abandoned water rights, the Court stated that "comprehensive participation, extinguishing duplicative and exaggerated rights, and ridding local records of stale, unused

19

water claims" are "all necessary to meet the objective of adjudicating Montana's water." *Adjudication of Rights in the Yellowstone River*, 253 Mont. at 179-80, 832 P.2d at 1217.

¶42    The Montana Water Use Act anticipates that there will be disagreements over the use of water among varying interests and "the integrity of Montana's adjudication process depends upon the assertion and ultimate resolution of these varying interests. The provisions of the Act charge all water users with the duty of asserting and defending their interests." *Bean Lake II*, 240 Mont. at 42, 782 P.2d at 900. This Court has recognized the importance of an adjudication process to firmly establish existing water rights and the necessity of "comprehensive participation, extinguishing duplicative and exaggerated rights, and ridding local records of stale, unused water claims." *Adjudication of Rights in the Yellowstone River*, 253 Mont. at 179-80, 832 P.2d at 1217.

¶43    The Water Court expressed concern in its opinions on this issue about the consequences of allowing MTU to litigate its objections to the Claimants' claims. The Court expressed concern in the Western Watersheds opinion over using the public trust doctrine as a "trump card to rearrange the ladder of appropriation priorities in any water source . . . ." This is not an issue in the MTU case. Neither MTU nor any other participant has advocated using the public trust doctrine to rearrange appropriation priorities. The Water Court also expressed concern that if any person making recreational use of water has a property interest in the water rights adjudication, then they have not been receiving notice and the effort to adjudicate Montana's water rights "would be for naught." It appears from the record that the Water Court has been scrupulously following the public notice requirements of the water adjudication statutes, including providing notice to all persons who

20

request notice of decrees. Section 85-2-232, MCA. In addition, the present case is the first one noted in which the Water Court has narrowed, rather than expanded, the scope of participation. *See e.g. Bean Lake I.* There is no showing that allowing MTU to be heard on its objections would jeopardize 31 years of water adjudications.

¶44 Last, the Water Court expressed concern that allowing MTU to be heard would "open the process to a multitude of objections" that would overwhelm the process. First, this is contrary to past cases such as *Bean Lake I* in which the Water Court *invited* all interested persons to participate as objectors. At that time participation by public interest groups like the Montana Stockgrowers Association was expressly viewed as a benefit to the adjudication process. Second, the Water Court, as a court, has sufficient procedural tools and powers to ensure that its proceedings do not get bogged down with the presentation of repetitive or immaterial evidence, or dilatory tactics. This includes, for example, the power to consider "relevant evidence" (§ 85-2-227, MCA); the power to appoint water masters (§§ 3-7-301 and -311, MCA); and the power to require mediated settlement conferences (§ 85-2-233(5)(b), MCA). Montana courts often confront similar issues in multi-party cases and we are confident that the Water Court can do the same.

¶45 The decision of the Water Court is reversed and this matter is remanded for further proceedings consistent with this opinion.

/S/ MIKE McGRATH

We concur:

/S/ BETH BAKER

21

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
Justice James C. Nelson, concurring in part and dissenting in part.

¶46 I concur in the narrow result of the Court's decision, holding that MTU has standing in the Water Court vis-à-vis the Big Hole River basin water rights adjudication. Respectfully, however, I dissent from two facets of the Court's analysis.

¶47 First, while I agree that justiciability requirements (standing, in particular) apply to the Water Court, I do not agree that this is a matter of "common law." Second, while I agree that MTU has standing under the governing statutes, I do not agree with the breadth of standing the Court has construed those statutes to accord. I address these two points in turn.

**Justiciability**

¶48 The Supreme Court has held that courts created under Article III of the United States Constitution are limited in their exercise of judicial power to the adjudication of "cases" and "controversies." *Flast v. Cohen*, 392 U.S. 83, 94-95, 88 S. Ct. 1942, 1949-50 (1968). This Court has held that courts created under Article VII of the Montana Constitution are subject to the same limitation. *Greater Missoula Area Fedn. of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 22, 353 Mont. 201, 219 P.3d 881; *Olson v. Dept. of Revenue*, 223 Mont. 464, 469-70, 726 P.2d 1162, 1166 (1986). The so-called "common law rules of standing" to which the Court refers in today's Opinion are, in reality, criteria designed to enforce this case-or-controversy limitation. *Heffernan v. Missoula City Council*, 2011 MT 91, ¶¶ 29-33, 360 Mont. 207, ___ P.3d ___; *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S. Ct. 1142, 1148-49 (2009). Ripeness, mootness, advisory opinion, and political

22

question are other such justiciability doctrines which serve to assure that the court has before it a proper "case" or "controversy." *Greater Missoula*, ¶ 23; *Flast*, 392 U.S. at 95, 88 S. Ct. at 1950.

¶49 Why the Water Court is a court to which the justiciability doctrines apply is a threshold question left unaddressed by the Court's Opinion. Simply being denominated a "court" does not automatically bind a tribunal to the case-or-controversy restrictions. An example of this can be seen in the District of Columbia Superior Court and the District of Columbia Court of Appeals (which are distinct from the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit). Congress created these two "Article I courts" pursuant to Article I, Section 8, Clause 17 of the United States Constitution. Although they exercise federal judicial power with respect to local laws, the District of Columbia courts are not bound by the strictures of Article III. *Palmore v. United States*, 411 U.S. 389, 93 S. Ct. 1670 (1973); *McIntosh v. Washington*, 395 A.2d 744, 749 n. 10 (D.C. 1978). That includes the case-or-controversy limitation. *Lee v. Dist. of Columbia Bd. of Appeals and Review*, 423 A.2d 210, 216 n. 13 (D.C. 1980). Thus, while these courts have applied justiciability requirements for policy reasons, *Atchison v. Dist. of Columbia*, 585 A.2d 150, 153 (D.C. 1991), they have understood that those requirements may be legislatively overridden, *Grayson v. AT&T Corp.*, 15 A.3d 219 (D.C. 2011) (addressing whether amendments to the D.C. Code eliminated the court's self-imposed standing requirement).[1]

---

[1] The Supreme Court's jurisprudence on the subject of non-Article III courts and administrative agencies that exercise the federal judicial power has been characterized aptly

¶50 The fact that the Water Court performs an adjudicatory function is also not dispositive. In Montana, there are various agencies that exercise a "quasi-judicial" function, which means "an adjudicatory function . . . involving the exercise of judgment and discretion in making determinations in controversies." Section 2-15-102(10), MCA; *see e.g.* §§ 2-15-1704(5) (Board of Labor Appeals), -1706(3) (Human Rights Commission), -1819(5)(a) (Board of Research and Commercialization Technology), -2029(1)(a) (Public Safety Officer Standards and Training Council), -2502(8) (Transportation Commission), -3105(4) (Board of Milk Control), -3303(4) (Board of Oil and Gas Conservation), -3402(5) (Fish, Wildlife, and Parks Commission), MCA. These bodies hold hearings; evaluate and pass on facts; interpret, apply, and enforce existing rules and laws; grant or deny privileges, rights, or benefits; award compensation; and order action or abatement of action. Section 2-15-102(10), MCA. Yet, while these proceedings are "judicial" and "adjudicatory" in nature, I am aware of no case in which we have required the parties participating in the proceedings to satisfy the criteria of constitutional standing, ripeness, mootness, and the like.

¶51 The error in the Court's Opinion, therefore, is the suggestion that our justiciability doctrines are based in common law. This poses the danger of importing these doctrines

---

as "not admit[ting] of easy synthesis," *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 91, 102 S. Ct. 2858, 2881 (1982) (Rehnquist & O'Connor, JJ., concurring in the judgment), and "one of the most confusing and controversial areas of constitutional law," *id.* at 93, 102 S. Ct. at 2883 (White, J., Burger, C.J., & Powell, J., dissenting). Insightful discussions of this subject are provided in Paul M. Bator, *The Constitution as Architecture: Legislative and Administrative Courts Under Article III*, 65 Ind. L.J. 233 (1990), and James E. Pfander, *Article I Tribunals, Article III Courts, and the Judicial Power of the United States*, 118 Harv. L. Rev. 643 (2004). The ability of the Montana Legislature to vest judicial power in non-Article VII tribunals and agencies presents an equally difficult question. I do

wholesale into contexts for which they were not intended, or the risk of misapplying the doctrines due to a lack of understanding of their function and purpose. Standing requirements, such as the showing of an injury to a property or civil right (Opinion, ¶ 27), were adopted to enforce the case-or-controversy limitation on a particular class of courts. Hence, the applicability of those requirements depends, obviously, on whether the given tribunal is limited, by the constitutional or statutory provision establishing it, to entertaining only "cases" and "controversies."

¶52 Unlike Article III, Section 2, Clause 1 of the United States Constitution, there is no provision in the Montana Constitution limiting the judicial power of the state to specific classes of "cases" and "controversies." The only express case-or-controversy limitation is in the grant of jurisdiction to the district courts under Article VII, Section 4. *See Olson*, 223 Mont. at 469-70, 726 P.2d at 1166 (observing that the language "all civil matters and cases at law and in equity" in Article VII, Section 4(1) "has been interpreted as embodying the same limitations as are imposed by federal courts under the Article 3 'case or controversy' provision of the United States Constitution"). This Court is not expressly limited to hearing only "cases" and "controversies."[2] Mont. Const. art. VII, § 2(1). Nor are the justice courts, which have "such original jurisdiction as may be provided by law" (except trial jurisdiction

_____

not reach that question here, however, as it is not necessary to do so for reasons that will become clear.

[2] There was an "all cases at law and in equity" provision in the 1889 Constitution concerning the jurisdiction not only of the district courts, but also of the Supreme Court. *See* Mont. Const. art. VIII, §§ 3, 11 (1889). Thus, some of our cases under the 1889 Constitution state that this Court was likewise limited to cases and controversies. *See e.g. Chovanak v. Matthews*, 120 Mont. 520, 525-26, 188 P.2d 582, 584-85 (1948). There is no such express limitation in the 1972 Constitution, however.

in felony cases). Mont. Const. art. VII, § 5(2). The Constitution allows for the creation of "other courts as may be provided by law." Mont. Const. art. VII, § 1. But these courts are also not expressly limited to hearing only "cases" and "controversies." Accordingly, if such a limitation applies to all Montana courts—and we have suggested this on several occasions, *see Greater Missoula*, ¶ 22, and cases cited therein—then it must be implicit in the term "judicial power" as that term is used in Article VII, Section 1.

¶53 I need not delve into that issue here, however, as it is apparent from the statutes establishing the water divisions and the water judges that the Water Court was set up as a specialized version of the district courts. There are four water divisions established to adjudicate water rights. Sections 3-7-101, -102, MCA. The boundaries of the four water divisions are formed by the natural divides between drainages within the state. Section 3-7-102, MCA. Each water division is presided over by a water judge. Section 3-7-101, MCA. Each water judge must be a district court judge or a retired district court judge of a judicial district wholly or partly within the water division. Section 3-7-201(1), MCA. "A water judge, when presiding over a water division, presides as district court judge in and for each judicial district wholly or partly within the water division." Section 3-7-201(3), MCA. The activities of the water judges are supervised by this Court. Section 3-7-204(1), MCA; *cf.* Mont. Const. art. VII, § 2(2) ("[The supreme court] has general supervisory control over all other courts.").

¶54 If the Water Court is effectively a specialized district court assigned to make water right determinations within its jurisdiction—and, in light of the foregoing statutes, I conclude that it is—then it follows that the Water Court is limited, like district courts, to adjudicating

26

only cases and controversies. As such, MTU must satisfy constitutional standing requirements (a past, present, or threatened injury to a property or civil right that would be alleviated by successfully maintaining the action) and prudential standing requirements (an injury that is distinguishable from the injury to the public generally, though not necessarily exclusive to the plaintiff).[3] *Heffernan*, ¶ 33. In this regard, I note that MTU alleges that Claimants' water right claims, as set forth in the decree, will injure not only MTU itself, but also its members. *See* Opinion, ¶¶ 5, 33. In other words, MTU asserts the rights of its members. *See Heffernan*, ¶¶ 42-46 (discussing the doctrine of associational standing).

¶55 For the sake of brevity, I will not engage in an analysis of how MTU has satisfied the foregoing standing criteria. I agree with the result of the Court's decision on this point, as well as much of the Court's rationale. The purpose of this discussion is not to address whether MTU has met constitutional and prudential standing requirements. It is to explain, rather, why MTU must meet those requirements in the first place. As discussed, the reason is not due to generally applicable "common law rules" as the Court suggests, but because the Water Court is subject to the same case-or-controversy limitations as the district courts.

### Statutory Construction

¶56 Besides the case-or-controversy requirements, there are statutory restrictions on who may appear before the Water Court. MTU contends that to the extent the statutory standing rules preclude it and its members from obtaining a remedy for alleged injuries, the statutes

---

[3] We noted in *Heffernan*, ¶ 34, that the Legislature may modify or abrogate prudential standing requirements. But MTU has not raised that point here, and I have thus assumed that the requirement of a distinguishable injury is still required.

violate Article II, Section 16 of the Montana Constitution. Since I conclude that MTU has standing under the statutes, however, I do not reach that issue.

¶57 At the outset, I agree with the Court's holding (under Issue 1) regarding the Water Court's application of § 85-2-223, MCA. In addition, I agree with the Court's conclusion (also under Issue 1) that while the Legislature has expressly identified the persons who have standing to file an objection to an application for a *new* water right, § 85-2-308(3), MCA, there is no statutory restriction on who is entitled to file an objection to a claim of an *existing* water right. Accordingly, I focus below on my disagreement with the Court's interpretation (under Issue 2) of § 85-2-233, MCA, which identifies the persons entitled to a hearing on an objection.

¶58 Section 85-2-233(1)(a)(iii), MCA, states, in relevant part, that "[f]or good cause shown . . . , a hearing must be held before the water judge on any objection to a temporary preliminary decree or preliminary decree by . . . any person within the basin entitled to receive notice under 85-2-232(1)." The persons entitled to receive notice include any "interested persons who request service of the notice from the water judge." Section 85-2-232(1)(f)(iii), MCA. "Good cause shown" means "a written statement showing that a person has an ownership interest in water or its use that has been affected by the decree." Section 85-2-233(1)(b), MCA.

¶59 At issue here is the "good cause" requirement. The Court reasons that because the State owns the waters of Montana and holds them in public trust for the benefit of its people, and because MTU's members have "personal environmental and recreational interests" in the Big Hole River basin, MTU therefore has a sufficient "ownership interest" in water or its use

28

to demonstrate "good cause" for a hearing on MTU's objections. Opinion, ¶¶ 33-34. In so doing, the Court effectively reads the "good cause" requirement out of the statutory scheme. The Court holds that where a party has met all "common law" standing requirements and has satisfied the minimal statutory requirements of requesting notice and filing an objection, that is sufficient and the party is entitled to a hearing. The Court rejects the notion that such party must make any further showing. The statutory requirement of "good cause" either is not at issue or is simply subsumed into the party's request for notice and filing of an objection. I do not believe this approach is faithful to the intent of the statute.[4]

¶60 The Court has used the fact that "[t]he State holds title to the surface waters of Montana for the benefit of its citizens" (Opinion, ¶ 30) to drain the term "ownership" in the statute of any force or relevance. Indeed, according to the Court's reasoning in ¶ 34, a person has a "sufficient ownership interest" if (1) he or she is a citizen of Montana and (2) he or she alleges a personal environmental and recreational interest in the particular water basin. While the Court claims this approach does not render the word "ownership" meaningless or expand the right to be heard on an objection to every person in the state (Opinion, ¶ 35), it is difficult to perceive any real parameters on the Court's construction. And the Court, pointedly, chooses not to set any sideboards on the language it uses. Arguably, a resident of Libby planning a fishing trip to the Big Hole River has a personal environmental and recreational interest in that basin. So does a resident of Wolf Point who is planning a

_____

[4] Incidentally, the Court relies on the Water Right Adjudication Rules and various precedents of this Court and the Water Court illustrating the importance of broad rights of participation in water adjudications. Yet, though these authorities may be evidence of what

camping trip to the area. Likewise, high school students in Broadus who intend to study insect life along the shores of Montana's streams have a personal environmental and recreational interest in the river. And since the State holds the river's water in trust for all of these individuals, it appears they are all entitled to hearings on their objections. In effect, the Court has transformed the adjudication of water rights into a broad public participation process—a result not contemplated by the statutory scheme.

¶61 In my view, "the State's ownership of the waters of Montana" (Opinion, ¶ 34) is beside the point. The statute refers to "an ownership *interest* in water or its use." Section 85-2-233(1)(b), MCA (emphasis added). While it is not immediately clear what this means, what is clear is that the Legislature could not have meant an ownership interest premised on the fact that the State owns the waters on behalf of its citizens. Otherwise, there would have been no need to use the modifier "ownership"; the Legislature could have simply referred to any Montana citizen who has "an interest in water or its use" and omitted the term "ownership." Surely, however, the Legislature recognized that the State owns the waters as a matter of constitutional decree and that citizens only "appropriat[e]" the waters for beneficial uses. Mont. Const. art. IX, § 3(3). Hence, it is evident that "ownership interest" must refer to something other than "the State's ownership of the waters of Montana."

¶62 Indeed, MTU concedes that "an ownership interest in water" refers to "a water right claim." The question, therefore, is what "or its use" refers to. Addressing this question, MTU points out that because a water right is a usufructuary right—i.e., "[a] right for a

---

*the Judiciary* believes is good policy, they are not evidence of what *the Legislature* intends. To discern the latter, we must look to the statutes themselves.

certain period *to use and enjoy* the fruits of another's property without damaging or diminishing it, but allowing for any natural deterioration in the property over time," *Black's Law Dictionary* 1684 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009) (emphasis added)—it would be redundant for the statute to mean "an ownership interest in water or [an ownership interest in] its use," as these two clauses mean the same thing. Being usufructuary, an ownership interest in water *is* an ownership interest in its use. Thus, MTU posits that "or its use" has independent meaning in light of the statutory context and refers to an interest in the use of water not premised on a water right claim. I agree.

¶63 The Water Court is required to provide notice of a temporary preliminary decree or preliminary decree not only to each person who has filed a claim of existing water right within the decreed basin, but also to any "other interested persons who request service of the notice." Section 85-2-232(1)(b), (f)(iii), MCA. Clearly, participation in the adjudication at the preliminary decree stage by persons besides those claiming water rights is contemplated. Indeed, why would "other interested persons" be entitled to notice if they did not also have the corresponding right to participate meaningfully in the adjudication and be heard on objections? Moreover, "any party who is affected by the decision and who participated in the matter" is allowed to appeal an interlocutory ruling by the Water Court on a question of law. Section 85-2-235(3), MCA. Again, the statutory scheme contemplates the involvement of individuals besides the water right claimants.

¶64 It seems to me that the critical limiting language of the statute is to be found in the phrase "that has been affected by the decree." *See* § 85-2-233(1)(b), MCA (" '[G]ood cause shown' means a written statement showing that a person has an ownership interest in water

31

or its use *that has been affected by the decree*." (emphasis added)). In context, this language indicates a personal and concrete (rather than conjectural) injury flowing from the decree. This interpretation is consistent with the aforementioned appeal statute, which refers to parties who are "affected" by the court's decision. Section 85-2-235(3), MCA. It is also consistent with the statutory counterparts governing *new* water rights (as opposed to *existing* water rights, which are at issue here). These statutes provide that "[a] person has standing to file an objection . . . if the property, water rights, or interests of the objector would be *adversely affected* by the proposed appropriation," § 85-2-308(3), MCA (emphasis added), and that a contested case hearing shall be held on valid objections, § 85-2-309(1), MCA.

¶65 In light of the foregoing, I would hold that a demonstrated interest in the use of the water, coupled with a personal and concrete injury resulting from the decree, is necessary to establish "good cause" under the statute. Here, MTU has met this requirement in light of the organization's restoration efforts and accomplishments in the Big Hole River basin, its expenditures to achieve those ends, and the specific and concrete harms that will result from unsupported large water right claims. *See* Opinion, ¶¶ 5, 8.

**Conclusion**

¶66 In sum, I agree that the decision of the Water Court must be reversed. MTU has satisfied constitutional, prudential, and statutory standing requirements. But I disagree with the notion of "common law rules of standing," and I also disagree with the Court's broad construction of § 85-2-233(1)(b), MCA. The net result of the Court's analysis is to expand the recognized parameters of standing beyond sustainable limits.

32

¶67 For the reasons set forth, I concur in the result of the Court's decision but dissent from the Court's analysis under Issue 2.

/S/ JAMES C. NELSON

Justice Jim Rice, dissenting.

¶68 The Court offers several times that "there are no stated limits on who can file objections to claims in temporary preliminary decrees" under statute, *see* Opinion, ¶¶ 36, 21, 23, and reasons that this absence of limitation necessarily translates into a likewise broad right to a hearing. Opinion, ¶ 36. The Court concludes that MTU "has a sufficient ownership interest in water or its use" under § 85-2-233(1)(b), MCA, to have a right to a hearing on its objections. Opinion, ¶ 34. I disagree with the Court's statutory interpretations and the conclusions reached thereby. I would affirm the Water Court.

¶69 That there are "no limits on who can file objections" is true only in a most technical sense, for the statutes clearly impose a limitation upon objections which may proceed to hearing. Section 85-2-233(1)(a), MCA, provides:

> For good cause shown and subject to the provisions of subsection (9), *a hearing must be held before the water judge on any objection to a temporary preliminary decree or preliminary decree by*:
>     (i) the department;
>     (ii) a person named in the temporary preliminary decree or preliminary decree;
>     (iii) any person within the basin entitled to receive notice under 85-2-232(1); or
>     (iv) any other person who claims rights to the use of water from sources in other basins that are hydrologically connected to the sources within the decreed basin and who would be entitled to

33

> receive notice under 85-2-232 if the claim or claims were from sources within the decreed basin.

(Emphasis added.) Only those included on this list are eligible to have a hearing by right. Any others are not and, therefore, a limitation upon actionable objections is inherent within the statutory structure.

¶70    MTU is included on this list of eligible objectors because it requested service of notice of the temporary preliminary decree from the Water Court, under § 85-2-232(1)(f)(iii), MCA, which any interested person can do.[1] However, merely requesting notice of the decree does not create the right to proceed to a hearing on an objection. Only those parties who can demonstrate "good cause" are entitled to a hearing, which is defined by § 85-2-233(1)(b), MCA, as "showing that a person has an ownership interest in water or its use that has been affected by the decree." MTU and others have offered various interpretations of this provision and policy rationales to paint the statute as ambiguous, but I believe the wording and the meaning are straightforward and that contortions are unnecessary.

¶71    First, "person" is defined as "an individual, association, partnership, corporation, state agency, political subdivision, the United States or any agency of the United States, or any other entity." Section 85-2-102(18), MCA. "Political subdivision" is further defined as, inter alia, a "public body of the state empowered to appropriate water." Section 85-2-102(19)(a), MCA. Then, a person must have "an ownership interest in water or its use." The key term is "ownership interest." Good cause thus requires a person to have an ownership interest, either in the water (a "state agency" or a "political subdivision"

34

representing the state), or in the water's use (parties who hold a water right). The statutory definition of good cause perfectly reflects the tenets of our longstanding water law: the water is owned by the state; water rights are property rights, usufructory in nature, extending to the use of the water. Water right holders thus have an ownership interest in the water's use. This plain wording application of the good cause provision also comports with the nature of water right adjudication as *in rem* proceedings, *Nev. v. United States*, 463 U.S.110, 144, 103 S. Ct. 2906, 2925 (1983) ("water adjudications are more in the nature of *in rem* proceedings"), which determine *inter sese* the rights among the holders.

¶72    Therefore, the conclusion that MTU "has a sufficient ownership interest" in either the water or its use is incorrect. Opinion, ¶ 34. Indeed, MTU does not even claim to have an ownership interest, but rather argues for interpretations of the statute which alleviate the requirement for ownership. Alternatively, MTU argues that, even if it has no right to a hearing, the Water Court may discretionarily grant it a hearing, as the statute "does not limit the Water Court's power to allow parties to participate . . . ." With this I agree. While the statute limits the parties who are entitled to a hearing as a matter of right, it does not limit the Water Court's discretion to conduct additional hearings, and the court's discretion would well be moved to give airing to the concerns of MTU, given its long and active involvement in the basin.

¶73    I agree with Justice Nelson's analysis that the Court has erred by importing common law standing concepts to this case. As he notes, the Water Court is a legislative creation, a

---

[1] MTU and the non-owner objectors within the companion case, Western Watersheds Project and Laurence D. Zuckerman, filed objections in the Water Court to over 100 water rights.

35

specialized court created to perform a specialized function.  In creating the Water Court, the Legislature specifically crafted the process to be followed by the court, including the standing requirements.  I would enforce them as enacted and intended.  While MTU makes several references to constitutional provisions within its arguments, it does not mount a constitutional challenge to the statutes governing the Water Court.  I further agree with Justice Nelson that the Court has broadly opened the Water Court to a public participation process which was not intended under the statutes.

/S/ JIM RICE