**FILED**

October 22 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0759

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 313

LOREN HEAVIRLAND, SUE HEAVIRLAND
and LYLE A. WEIST,

    Claimants and Appellees,

  v.

STATE OF MONTANA,

    Objector and Appellant.

APPEAL FROM:  Montana Water Court,
       Upper Missouri Division, Teton River Basin (41O), Cause No. 41O-97
       Honorable Russ McElyea, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

      Timothy C. Fox, Montana Attorney General, Jeremiah D. Weiner, Assistant
      Attorney General; Helena, Montana

    For Appellee:

      Justin B. Lee, Attorney at Law; Choteau, Montana

           Submitted on Briefs: August 7, 2013
                Decided: October 22, 2013

Filed:

       _____
             Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1    The State of Montana appeals from the Montana Water Court's Order that determined Loren Heavirland, Sue Heavirland and Lyle A. Weist (collectively, claimants) produced sufficient evidence to overcome the presumption of abandonment of their water right claim. We affirm.

## ISSUES

¶2    We address the following issues:

*1.    Did the Water Court correctly conclude that 79 Ranch governs the issue of abandonment?*

*2.    Did the Water Court correctly conclude that the claimants produced sufficient evidence to show they had no intent to abandon their water right?*

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background.

¶3    In 1904, Frank Truchot filed and perfected the water right which is the subject of this controversy. The water right, for surface water from Muddy Creek, was for 24.43 CFS to be applied by flood irrigation on a maximum of 645 acres. In 1913, Christina Weist, wife of Henry Weist, purchased the water right. The Weists used the water right to flood irrigate their farm. Raymond (Ray), Henry Weist's son, took over the farm in the mid-1940s. Ray stopped irrigating when he went into military service in 1941. He re-commenced irrigation in 1947-48. From that time until 1961, Ray used Muddy Creek for irrigation in years when water was available.

2

¶4      Ray's son, Lyle Weist (Lyle), explained the right was very difficult to use due to the slope of the ground and the heavy clay "gumbo" soil. Lyle stated in his supplemental affidavit that the Weists had to pump water from Muddy Creek uphill into a ditch along the north end of the property. To flood irrigate the property, Henry and Ray would dam the ditch to send water flowing in a southeasterly direction over the fields, back into Muddy Creek. Lyle explained: "[W]hen the property was flood irrigated in the spring and summer, the plants on the west side of the field drowned by the time the water reached the east side of the field." Ray and Henry attempted to counter the problem by irrigating the field only in late fall to put moisture in the ground for the next season; and by planting hardier crops, like alfalfa. These efforts proved unsuccessful. Ray also attempted using hand lines to irrigate his property. He decided against using a wheel line after seeing a wheel line fail on a similar neighboring property. In particularly dry years, when there was no water in Muddy Creek, Ray could not irrigate his crops. In the driest years, he had to resort to crop rotation. Ray completely ceased irrigating his fields by 1962, "due to the inefficient nature of flood irrigation." Lyle also stated in an affidavit that his father's age and deteriorating physical condition contributed to his decision to stop irrigating. Ray had the Sun River Electric Cooperative run three-phase power out to the property sometime in the late 1960s or early 1970s. This, Lyle stated, was in contemplation of the possibility that Lyle would want to run pivot irrigation when he one day took over the farm.

¶5      Lyle returned to the farm in 1975 and subsequently purchased it. In 1978, Lyle looked up the history of water rights on the property at the Teton County Courthouse. In

3

1981 he and his wife, Linda, filed a statement of claim in the Montana general stream adjudication. Lyle installed a 14-tower Valley Center Pivot during the winter of 1981-82 and resumed irrigating. He continued irrigating with the center pivot until 1991, when he sold the property and water right to the Heavirlands. The pivot cost over $125,000 and that expenditure, in part, forced Lyle to sell the farm. After the Heavirlands purchased the property, they irrigated every year except for one, when water was not available.

### B. Procedural Background.

¶6 Lyle and Linda Weist's claim appeared in the Temporary Preliminary Decree for Basin 41O with DNRC issue remarks. The issue remarks noted that the 1962 Teton County Water Resources Survey and 1978 USDA Aerial Photograph No. 178-177 appear "to indicate 0.00 acres irrigated." These remarks raised an issue of abandonment. No party filed objections to the Claim or to the DNRC issue remarks. Meetings between the claimants and the DNRC failed to resolve the issue remarks.

¶7 On December 8, 2008, DNRC Water Resource Specialist Kraig Van Voast (Van Voast) filed a Memorandum with the results of his review of the water right claim. Van Voast was not able to confirm historical irrigation from Muddy Creek on the claimed place of use. He reviewed the 1962 Teton County Water Resource Survey and the 1957 air photos used to produce the Water Resource Survey. Based on his review, it appeared Bynum Irrigation District "E" Canal may have serviced the claimed place of use at some time prior to 1962, but it did not appear to be serviced by a ditch system connected to Muddy Creek. Van Voast also reviewed several documents Loren Heavirland provided, including a 1941

4

aerial photo. Van Voast determined that none of this information resolved a lack of proof of historical irrigation from Muddy Creek. He stated none of the historical data sources he reviewed showed any of the ditches or canals that would be required to transport the water from the claimed point of diversion to the claimed place of use.

¶8 Because of the potential abandonment issue remark, the Water Master issued an order joining the State of Montana in the adjudication, through the Attorney General, pursuant to § 85-2-248(7), MCA. The State moved for summary judgment, or, in the alternative, partial summary judgment, on the issue of abandonment. Based on the factual record, the Water Master issued an order granting partial summary judgment to the State. The ruling found that the nonuse of the water right from 1962 to 1982 was a sufficiently long period of continuous nonuse to raise a rebuttable presumption of an intent to abandon the water right and to shift the burden of proof to the claimants to overcome the presumption.

¶9 The Water Master held an evidentiary hearing on the matter. The Water Master filed a Report containing findings of fact and conclusions of law. In his Report, the Water Master concluded the water right had been abandoned, reasoning:

> Nonuse of claim 41O 47356-00 from 1962 to 1982 is sufficient to establish a long period of continuous nonuse and shift the burden to the claimants to rebut the presumption of an intent to abandon the water right. The evidence presented by the claimants has not overcome that burden.

¶10 Claimants filed an Objection to the Water Master's Report with the Chief Water Court Judge. They set forth three main arguments: (1) Abandonment of existing water rights should be determined under the law as it existed prior to July 1, 1973; (2) the Water Master's

5

application of *79 Ranch* analysis to their existing right was therefore an impermissible retroactive application of the law; and (3) even if *79 Ranch* applied, the claimants had successfully rebutted the presumption of intent to abandon the water right by producing sufficient evidence explaining and excusing the long period of nonuse.

¶11 The Water Court ruled that *79 Ranch* applied to the claimants' case. The Water Court further found that the Water Master had erred in finding that the claimants had failed to produce sufficient evidence to rebut the presumption of intent to abandon.

¶12 The State appeals.

## STANDARD OF REVIEW

¶13 At the State's urging, we take this opportunity to clarify the standard of review.[1] Because the case involves both a Water Master and the Water Court, two standards of review are relevant: the standard the water judge applies to the Water Master's report and the standard we apply to the Water Court's opinion. Abandonment of a water right is a "question of fact." Section 89-902, RCM (1947).[2] Montana's Rule 53 is clear regarding the

---

[1] In *Weinheimer Ranch, Inc. v. Pospisil*, 2013 MT 87, ¶ 19, 369 Mont. 419, 299 P.3d 327, we applied our customary standard of review of the trial court's findings of fact for clear error and its conclusions of law for correctness. *Weinheimer Ranch*, ¶ 19. There, although the case involved the Water Court's review of findings made by a water master, the parties did not invoke a different standard of review and we did not consider it. We do so here.

[2] The 1973 Montana Constitution provides: "All existing rights to the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed." Mont. Const. art. IX, § 3(1). Pursuant to that provision, the Water Use Act preserves "existing rights." *See* §§ 85-2-101(4), 85-2-102(12), MCA. We have previously applied § 89-902, RCM, defining abandonment as a question of fact, to abandonment issues arising from pre-1973 water rights. *See 79 Ranch v. Pitsch*, 204 Mont. 426, 431, 666 P.2d 215, 217 (1983) ("Abandonment of a water right is a question of fact. Section 89-802, Revised Codes of Montana, 1947 (applicable here, repealed in 1973).").

standard of review that the Water Court applies to the findings of fact in a Water Master's report. "[T]he court must accept the master's findings of fact unless clearly erroneous." M. R. Civ. P. 53(e)(2).

¶14 Rule 53 does not subject conclusions of law to clear error review. The Water Court properly recognized that, in reviewing the master's conclusions of law, the "standard of review is plenary and [the court] . . . must determine whether the [master's] . . . conclusions are correct as a matter of law." *Geil v. Missoula Irrigation Dist.*, 2002 MT 269, ¶ 22, 312 Mont. 320, 59 P.3d 398. Thus, the Water Court reviews the Water Master's findings of fact for clear error and the Water Master's conclusions of law for correctness. M. R. Civ. P. 53(e)(2); *Geil*, ¶ 22.

¶15 "This Court applies the same standards of review to the Water Court as it does to an appeal from a district court." *Mont. Trout Unlimited v. Beaverhead Water Co.*, 2011 MT 151, ¶ 16, 361 Mont. 77, 255 P.3d 179. Whether the standard of review was applied correctly is a question of law. *See Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587, 593 (Fed. Cir. 1984).[3] We therefore review the Water Court's September 19, 2012, Order Regarding Abandonment *de novo*, to determine whether it correctly applied the clear error standard of review to the Water Master's findings of fact and whether its conclusions of law are correct. *See Morris Plan Industrial Bank v. Henderson*, 131 F.2d 975, 977 (2d Cir. N.Y.

---

[3] Although Fed. R. Civ. P. 53(e) was amended in 2003 to require *de novo* review of a master's findings instead of the clearly erroneous standard found in the Montana rule, cases decided under the pre-2003 federal rule are instructive.

7

1942) (Hand., L.) (in reviewing a district court's decision on a referee's report pursuant to Rule 53(e), "the question is the same in this court as it was in the district court.").

¶16 Even where the Water Master's findings find substantial support in the evidence, the Water Court still may determine that they were clearly erroneous. We have long recognized that "[s]ubstantial evidence and clearly erroneous are not synonymous[.]" *Interstate Prod. Credit Ass'n v. Desaye*, 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991). Thus, the court may determine that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948); *Desaye*, 250 Mont. at 323, 820 P.2d at 1287.

## DISCUSSION

¶17 *1.    Did the Water Court correctly conclude that* 79 Ranch *governs the issue of abandonment?*

¶18 The issue of which standard for determining abandonment applies is a legal conclusion. *See In re Musselshell River Drainage Area*, 255 Mont. 43, 50, 840 P.2d 577, 581 (1992) (stating "the Water Court correctly applied the thrust of *79 Ranch* to the facts before it."); *Haggin v. Saile*, 23 Mont. 375, 381, 59 P. 154, 155 (1899) (reviewing district court's determination of "the law as to what constituted abandonment" for correctness). We review the Water Court's legal conclusions to determine whether they are correct. *Weinheimer Ranch*, ¶ 19. The Water Court reviewed the Water Master's conclusion that *79 Ranch* applies to abandonment of a pre-1983 water right claim for correctness and

8

determined the Water Master correctly concluded the standard from *79 Ranch* applied. We agree.

¶19     *79 Ranch* provides that:

> [A] long period of nonuse is strong evidence of an intent to abandon the water rights. *In effect*, such a long period of continuous nonuse raises the rebuttable presumption of an intention to abandon, and shifts the burden of proof onto the nonuser to explain the reasons for nonuse . . . . To rebut the presumption of abandonment, there must be established some fact or condition excusing long periods of nonuse, not merely expressions of desire or hope.

*79 Ranch*, 204 Mont. at 432-33, 666 P.2d at 218 (emphasis added). In *In re Clark Fork River Drainage Area (Clark Fork II)*, we explained: "To rebut the presumption of abandonment, the claimant must establish some fact or condition excusing the long period of nonuse, not mere expressions of hope or desire reflecting a gleam-in-the-eye philosophy regarding future use of the water." *In re Clark Fork River Drainage Area*, 274 Mont. 340, 344, 840 P.2d 1353, 1355 (1995) (internal citations and quotations omitted).

¶20     Claimants contend that *79 Ranch* analysis should not apply because it could threaten their pre-1973 water right. Claimants argue that it is improper to apply post-1973 case law to pre-1973 water rights claims because they are "existing rights" and must be protected under the law as it existed in 1973. Because *79 Ranch* was not decided until June of 1983, and because it effected a change in the law, claimants assert, it should not apply.

¶21     The 1973 Montana Constitution provides: "All existing rights to the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed." Mont. Const. art. IX, § 3(1). Pursuant to that provision, the Water Use Act preserves "existing

9

rights." *See* §§ 85-2-101(4), 85-2-102(12), MCA. However, the protection of "existing rights" does not preclude applying post-1973 precedent. In *Musselshell River* we determined that *79 Ranch* does not offend the Montana Constitution's protection of existing rights. *In re Musselshell River Drainage Area*, 255 Mont. at 48-49, at 580-81. A strong presumption exists in favor of the retroactive application of new judicial rules of law. *Stavenjord v. Montana State Fund*, 2006 MT 257, ¶ 9, 334 Mont. 117, 146 P.3d 724. Thus, we agree with the Water Court that *79 Ranch* should be applied retroactively.

A.      79 Ranch *and existing rights.*

¶22     As the Water Court explained, we have already concluded the protection of pre-1973 existing water rights does not preclude applying our *79 Ranch* decision retroactively. We reiterate our statement in *Musselshell River*, equally applicable here, that *79 Ranch* "was not the stunning reversal appellants assert it to be." *Musselshell River*, 255 Mont. at 47, 840 P.2d at 579. *79 Ranch* did not overrule the past precedent relating to abandonment, it clarified how the law already essentially operated.

¶23     A finding of abandonment requires showing both nonuse and intent to abandon. *Thomas v. Ball*, 66 Mont. 161, 167, 213 P. 597, 599 (1923). A lengthy period of nonuse has long been considered "potent evidence" of an intent to abandon. *Smith v. Hope Mining Co.*, 18 Mont. 432, 438, 45 P. 632, 634 (1896) (nine years' nonuse of a water right, when that period exceeded the statute of limitations, was "very potent evidence, if it stood alone, of an intention to abandon."). Courts have long relied on testimony and evidence submitted by both parties to evince the circumstances of nonuse and elucidate whether intent to abandon

10

existed. *See Smith*, 18 Mont. at 438, 45 P. at 634; *Thomas*, 66 Mont. at 168, 213 P. at 600. Although the party alleging abandonment has historically carried the burden of proving intent to abandon, *Thomas*, 66 Mont. at 168, 513 P. at 600, the opposing party has always had to produce enough evidence to at least cast doubt on the existence of that intent. The court would then construe the circumstances surrounding the alleged abandonment—as established by the evidence the parties set forth—to determine whether intent to abandon existed. *See Featherman v. Hennessy*, 42 Mont. 535, 540-41, 113 P. 751, 753 (1911).

¶24 The shift from a long period of nonuse being considered "potent evidence" of an intent to abandon to its raising a rebuttable presumption such intent existed is merely an incremental change from the earlier rule. *Musselshell River*, 255 Mont. at 49, 840 P.2d at 580. The shift changes the timing of when the party opposing the abandonment finding must produce evidence of intent. Before 1973, a party opposing abandonment would defend against the claim by producing evidence and testimony at trial to establish the party did not intend to abandon a water right. Now, *79 Ranch* "is akin to a caveat to claimants that they should not rest their case without addressing the potent evidence of intent to abandon which arises from a long period of non-use." *Musselshell River*, 255 Mont. at 49, 840 P.2d at 580. This does nothing to change the policy that "the courts will not lightly decree an abandonment of a property so valuable [as water] in a semi-arid region such as this." *Thomas*, 66 Mont. at 167, 213 P. at 599. However, it also honors the age-old principle that:

> [A]s the settlement of the country has advanced, the great value of the use of water has become more and more apparent…As a result, the law, crystallized in statutory form, is that an appropriation of a right to the use of running water

11

flowing in the creeks must be for some useful or beneficial purpose, and when the appropriator, or his successor in interest, abandons and ceases to use the water for such purpose, the right ceases.

*Power v. Switzer*, 21 Mont. 523, 529, 55 P. 32, 35 (1898). *79 Ranch* operates primarily to clarify the law of abandonment as it has always existed.

¶25 Because we conclude that *79 Ranch* primarily clarified operation of the existing law, we do not assume that rights which are not protected under *79 Ranch* would be protected under the law as it existed prior to July 1, 1973. The Water Court correctly concluded that application of *79 Ranch* is not precluded by Montana's Constitution or statutes.

> B. 79 Ranch *and* Dempsey *retroactivity analysis.*

¶26 In our decision in *Dempsey v. Allstate Ins. Co.*, we held that "all civil decisions of this court apply retroactively to cases pending on direct review or not yet final, unless all three of the [factors from *Chevron Oil v. Huson*, 404 U.S. 97, 92 S.Ct. 349 (1971)] . . . are satisfied . . . ." *Dempsey v. Allstate Ins. Co.*, 2004 MT 391, ¶ 31, 325 Mont. 207, 104 P.3d 483. Importantly, *Dempsey* requires that the decision to be applied non-retroactively "must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Dempsey*, ¶ 21.

¶27 The claimants cannot satisfy the conjunctive, three-factor *Dempsey* test because we conclude the incremental shift in the law *79 Ranch* caused did not establish a new principle of law or decide an issue of first impression. We can see no reason why *79 Ranch* should not apply retroactively under these circumstances.

12

¶28 We hold that the Water Master and the Water Court correctly concluded *79 Ranch* governs the issue of abandonment in Montana.

¶29 *2. Did the Water Court correctly conclude that the claimants produced sufficient evidence to show they had no intent to abandon their water right?*

¶30 The State argues there is insufficient evidence to support the Water Court's finding that the claimants justified the twenty-year period of non-use of their water right. The State also argues that the Water Court committed error by improperly treating two of the Water Master's findings of fact as clearly erroneous without employing clear error analysis. Specifically, the State contests the Water Court's treatment of the Water Master's findings that (1) no specific evidence was introduced to demonstrate that age or infirmity contributed to Ray's decision to cease irrigating his property; and (2) installation of three-phase power to the claimant's predecessor's property did not indicate a plan to install a pivot irrigation system. This alleged "violation" of M. R. Civ. P. 53(e)(2), the State asserts, is so serious as to require reversal.

¶31 "The question of abandonment of the use of any of the waters was one of fact, dependent upon the evidence of the conduct, acts, and intent of the parties claiming the usufruct of the water." *Power*, 21 Mont. at 529, 55 P. at 34. As the Water Court observed, intent to abandon "need not be proved directly, but may be inferred from all the circumstances of the case." *Denver by Bd. Of Water Comm'rs v. Snake River Water Dist.*, 788 P.2d 772, 776 (Colo. 1990). "The circumstances must be such as to justify an inference

13

of intention to abandon; in other words, to leave the property to be taken by any other person who chooses to do so." *Featherman*, 42 Mont. at 540-41, 113 P. at 753.

¶32 We agree with the Water Court that determining whether a water right has been abandoned requires weighing all of the relevant factual circumstances of the case. *See Power*, 21 Mont. at 529, 55 P. at 34; *Denver by Bd. Of Water Comm'rs*, 788 P.2d at 776; *Featherman*, 42 Mont. at 540-41, 113 P. at 753. To successfully rebut a presumption of abandonment, a claimant must produce "[s]pecific evidence explaining or excusing the long period of non-use of the particular water rights on the specific property . . . ." *Musselshell River*, 255 Mont. at 51, 840 P.2d at 582. Specific evidence must relate to the specific non-use on the property in question. *Musselshell River*, 255 Mont. at 50-51, 840 P.2d at 581 (evidence, not specific to the acreage in question, that certain spans of years were "pretty dry" and "most people" did not have sufficient funds to reopen ditches was not sufficient to rebut the presumption of abandonment). A statement asserting lack of sufficient funds to irrigate is not enough, standing alone, to rebut a presumption of abandonment. *79 Ranch*, 204 Mont. at 218-19, 666 P.2d at 433.

¶33 The Water Court weighed the specific evidence regarding relevant factual circumstances the claimants had presented and concluded it was sufficient to overcome the presumption of abandonment. The Water Court held that the Water Master misapprehended the effect of the evidence the claimants presented, leaving the Water Court with the firm conviction the Water Master had committed clear error.

¶34 Our review of the record supports the Water Court's determination that the claimants submitted sufficient evidence to overcome the presumption of abandonment. Lyle testified extensively regarding the specific obstacles associated with irrigating the Weist's property. For instance, he stated: "[W]hen the property was flood irrigated in the spring and summer, the plants on the west side of the field drowned by the time the water reached the east side of the field." Although the record does not reveal Ray's age in 1962, there is no reason to doubt Lyle's testimony in his sworn affidavit that age and illness contributed to his father's decision to cease irrigating. And the decision to install three-phase power to the property, in contemplation of one day running a pivot irrigation system, is at least "slight" evidence that the Weists did not intend to abandon their water right. The fact that Lyle actually *did* install a pivot irrigation system when he was able to supports his assertion that Ray obtained three-phase power to the property believing his son might want to run such a system. Lyle resumed irrigation as soon as he installed the center pivot. Lyle's statement that he was forced to sell the farm in part due to the debt he incurred in purchasing the center pivot supports his testimony that financial hardship prevented irrigation for some time. Finally, Lyle actually filed and sold the water right. Unlike in *Musselshell River*, all of these facts and assertions provided specific context for nonuse of the specific water right at issue.

¶35 The State challenges the Water Court's failure to apply clear error analysis to the Water Master's fifth factual finding. The Water Master found:

> The testimony addressing Raymond Weist's conduct from 1962 to 1975 is minimal. Lyle Weist testified only in general terms regarding this period of time. From this testimony, it appears that Raymond simply gave up trying to

15

irrigate a difficult field. It is implied that advancing age and health issues may have played a role, but nothing specific was provided to give any substance to these implications. In the late 1960s or early 1970s, Raymond Weist had three phase power installed on the property. Lyle testified that Raymond had asked him if he ever intended to irrigate the property in the future. Lyle indicated that he hoped to be able to do so. Based on this potential, Raymond proceeded to have the power company bring three phase power to the property. From Lyle's testimony, it appears that the three phase power was installed for two reasons: (1) if they ever did get back to irrigating the property with a center pivot system, it would require three phase power, and (2) it was convenient. The power company was doing work in the area at the time. The motivation for three phase power was a possible center pivot system, but there was no actual plan to install such a system.

¶36 The State argues that the Water Court ignored the paucity of evidence in the record when it rejected the Water Master's finding that the Weists did not justify the period of non-use. The finding of abandonment, however, depends upon the entire factual circumstances surrounding the case. *See Power*, 21 Mont. at 529, 55 P. at 34; *Featherman*, 42 Mont. at 540-41, 113 P. at 753. The Water Master examined all of those factual circumstances and found them insufficient to show the claimants did not intend to abandon their water right. Thus, the Water Master found the right had been abandoned.

¶37 The Chief Water Judge, looking at the same factual circumstances, concluded the Water Master's finding misapprehended the effect of the evidence. In the Water Court's view, the factual circumstances—including Lyle's testimony and the evidence of the Weists' acts—demonstrated the claimants did not intend to abandon their water right. In light of its review of the relevant circumstances, the Water Court concluded that the Water Master had "misapprehended the totality of the evidence, leaving the [Water] Court with a firm conviction a mistake was committed."

16

¶38    In light of the Water Court's thorough consideration of the "entire evidence," *U.S. Gypsum*, 333 U.S. at 395, 68 S. Ct. at 543, we conclude that the Water court correctly applied the clear error standard of review.

## CONCLUSION

¶39    The Water Court correctly applied *79 Ranch* analysis.  The Water Court correctly concluded that the claimants submitted sufficient evidence to rebut the presumption of abandonment.

¶40    Affirmed.

/S/ MICHAEL E WHEAT

We concur:

/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ BRIAN MORRIS