

DA 13-0570

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 120

ERNEST E. NELSON,

        Objector and Appellant,

  v.

RANDALL BROOKS and ILA MAE BROOKS,

        Claimants and Appellees.

APPEAL FROM:    Water Court
                    Case No. 41D-189, 41D 40063-00
                    Honorable Russ McElyea, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Peter Guillum Scott; Gough, Shanahan, Johnson & Waterman, PLLP;
                Bozeman, Montana

        For Appellees:

                Randall Brooks and Ila Mae Brooks, self-represented; Dillon, Montana

                        Submitted on Briefs:  April 2, 2014
                                   Decided:  May 7, 2014

Filed:

                                Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1    Ernest Nelson (Nelson) appeals from an order of the Montana Water Court filed July 31, 2013, dismissing his objections to the water rights claim by Randall and Ila Mae Brooks (the Brooks). The Brooks' claim was contained in the Water Court's Temporary Preliminary Decree for the Big Hole River Basin (41D) issued on April 6, 2007. We affirm.

**ISSUES**

¶2    A restatement of the issues on appeal is:

¶3    *1.  Did Nelson have a previously adjudicated right to the Disputed Well?*

¶4    *2.  Did the motion to amend the Statement of Claim by the Brooks repudiate the originally filed claim?*

¶5    *3.  Did the Water Court err by relying on the Brooks' filed Statement of Claim as prima facie proof of the water right?*

¶6    *4.  Did the Water Court err in concluding that it need not consider whether the Brooks' claimed right was a "use" right or "filed" right?*

¶7    *5.  Did the Water Court err in concluding that sufficient evidence existed to amend the Brooks' purpose of use to include domestic use?*

¶8    *6.  Did the Water Court err in concluding that ownership of the point of diversion for the claim was not dispositive of the ownership of the water right?*

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

¶9    This case involves a dispute over the water rights to a well (Disputed Well) located in Beaverhead County, in the northwest quarter of the southeast quarter of the southeast quarter of Section 5, Township 4 South, Range 9 West, P.M.M. (all Sections referred to hereafter are in this township and range). The Disputed Well is located on federal Bureau of Land Management (BLM) land. Several mining claim sites were historically situated throughout BLM land in Sections 4, 5, 8, and 9. Private land holdings surround the BLM land. The mining claim (also called a mill site) where the Disputed Well is situated was originally established by Minerals Engineering in the early 1950s for processing tungsten ore. Minerals Engineering drilled several wells, including the Disputed Well, for different purposes including operation of the mill and domestic use for the miners.[1] In 1963, Minerals Engineering filed a Declaration of Vested Groundwater Rights for 100 gallons per minute (gpm), listing the Disputed Well as the diversion point, means of withdrawing as an electric driven pump, and claiming continuous use for "primarily domestic" purposes since 1954.

¶10    Adjacent to the Minerals Engineering site, Carl Kambich owned a ranch (Kambich Ranch). Several documents were presented showing cooperation between Minerals Engineering and Carl Kambich (Kambich) since the early 1950s for wells, fences, etc. Most of the documents presented concern a well drilled by Minerals Engineering in

---

[1] A 1990 BLM memorandum written during cleanup of the site identifies five wells in Section 5, and a spring in Section 8.

another mining claim site located in Section 8 (Section 8 Well). This well was drilled sometime around 1955, and the project report states it provided inadequate water for the mining operations so was traded to Kambich for "other considerations." This well has a limited flow, between 1/5 to 1/2 gpm, and uses natural artesian pressure to transfer water downhill to a stock tank. The current user of this well is not known, but documents relating to the maintenance and improvement of the Section 8 Well, signed by the Kambich family, are dated as late as 2007.[2] Nelson and the Brooks agree that this is not the well the Brooks have been using.

¶11 Another document of importance between Kambich and Minerals Engineering, dated July 1, 1953, is simply entitled "Indenture." This document grants Kambich the "sole and exclusive right" to a water well "on Minerals No 3 mill site mining claim." No further description of the well is given, but the Indenture grants the "right to enter into and upon said mill site claim, and to pump water from said well, to water stock thereat, or to convey all or any part of the water from said well across said mill site claim by ditch or pipe line to adjoining lands." The well conveyed in this Indenture is the subject of further discussion below.

¶12 On April 15, 1982, Kambich filed a Statement of Claim for Existing Water Rights (numbered 41D-40063). The Statement of Claim described an unnamed well located in the northwest quarter of the southeast quarter of the southeast quarter of Section 5; a place of use in Section 4, due east from the well and within the mill site boundaries (first

---

[2] The Water Master's report states that the "exhibits indicate that Kambich is still using the section 8 well, at least as of 2000."

place of use); a priority date of January 1, 1954; a pump as means of diversion; and a flow rate of 100 gpm. The purpose of use was noted as stock water, and the right was declared to be a filed appropriation right. Attached to the Statement of Claim was a map with a hand drawn point of diversion and place of use; a copy of the 1963 Declaration of Vested Rights originally recorded by Minerals Engineering for the Disputed Well; and the 1953 Indenture. The map appears to indicate the Disputed Well as the diversion point, and the Water Master and Water Court both interpreted it to be for this well.[3]

¶13 The Brooks purchased the Kambich Ranch in 1990. Kambich filed a notice of transfer of water right for claim 41D-40063 to the Brooks on August 1, 1990. The Brooks operated the ranch until 1993 when they sold off all but 120 acres, which they still own. In 1990, the Brooks claim the Disputed Well was not used at the first place of use, but instead provided water to a barn on the ranch for a bathroom and kitchen, as well as stock water pumped by means of an above-ground hose into tanks northwest of the well in Section 5 (second place of use). In 1993, the Brooks were granted a right-of-way permit by BLM to bury water pipe and electrical lines from the Disputed Well. Though the permit identifies the location of the right-of-way as the eastern half of the northeast quarter of the southwest quarter of the southeast quarter of Section 5, only a portion of the lines travel through this area as the well is located in the adjacent west half of the northwest quarter of the southeast quarter of the southeast quarter of Section 5. However, attached to the permit, and incorporated by reference, is a map with a hand drawn

_____

[3] Also of note, the 1990 BLM memo only identifies the Disputed Well as having an existing pump.

5

location showing a line from the Disputed Well to a location that appears to be the barn, northwest of the well.

¶14    In 2006 or 2007, the barn was converted into a home for the Brooks' son, Tim. The barn has since been sold, and the Disputed Well is no longer its source of water. The barn now uses a different well on BLM land, 200 feet north of the Disputed Well. Tim was granted a right-of-way permit by BLM to access this well in 2007. The Brooks also built a new home in 2007, in the southeast quarter of the northeast quarter of the southwest quarter of Section 5, northwest of the Disputed Well and west of the barn. The Brooks currently use the Disputed Well as the water source for this home (third place of use), though they apparently did not file a request to change place of use with the DNRC. The water is conveyed by underground pipe. They claim to have been using the water in this location at a travel trailer since 1993, prior to and while building their home.

¶15    Minerals Engineering ceased its operations at some point in 1976. Successors to Minerals Engineering included General Electric Corporation (GE), Union Carbide Corporation, and Leonard Garrand (Garrand). In 2002, Nelson purchased the mine interests from Garrand, and in 2007, Apex Abrasives (Apex), a company organized by Nelson, received a permit for mining operations on the site. Nelson claims BLM did not notify him of the Brooks' use of the Disputed Well, but he discovered it in 2007. Apex subsequently drilled a new well from which it gets 115 gpm.[4]

---

[4] The location of this well is not described and the associated water rights claim number is not given.

6

¶16 While the mining claims were in the hands of GE, GE filed three statements of claim for water rights. Claim 41D-92881 is for a surface water right, apparently with a point of diversion out of the Big Hole River. Claim 41D-92882 and 41D-92883 are both well claims with a priority date of December 31, 1954, a point of diversion in the south half of the southeast quarter of Section 5, and a place of use in the southeast quarter of the southeast quarter of Section 5. In a separate proceeding (case 41D-167), the Water Court considered objections to these three claims and issued post-decree abstracts for each in 2012. The two well claims were granted to Nelson for a combined total not to exceed 100 gpm. The Brooks did not object in this proceeding.

## B. Procedural Background

¶17 The current Water Court case involves only the 41D-40063 claim originally filed by Kambich. BLM, GE, and Nelson all objected to the claim. BLM and GE later withdrew their objections, leaving Nelson as the sole objector. The abstract for the claim contained DNRC issue remarks indicating that claims 40063, 92882, and 92883 all appeared to be duplicate claims for the same historic appropriation of water due to the similarity in priority dates and point of diversion. The remarks also stated that "ownership of this right may be questionable [because t]he place of use appears to be on federal land."

¶18 On May 17, 2011, prior to hearing, the Brooks filed a motion to amend the Kambich Statement of Claim. They sought to amend the place of use to the third and current place of use in Section 5; the priority date to June 15, 1953; the type of right to

"use" rather than "filed"; and the flow rate to 10 gpm. On May 26, 2011, a DNRC water resource specialist filed a memorandum recommending acceptance of all requested amendments. Specifically, the memorandum notes that the 1953 Indenture "transferred ownership of this well from Minerals Engineering Company to the Kambich ranch." As to place of use, the specialist determined that "it is possible that stock were watered on the Brooks property prior to 1973." Finally, it notes that if the amendments were accepted, all issue remarks could be removed.

¶19    The matter proceeded to a hearing with the Water Master. Nelson argued that the Disputed Well was not located within the right-of-way granted to the Brooks by BLM in 1993; he was the owner of the Disputed Well; he was the owner of the 100 gpm associated with the well pursuant to case 41D-167; if the Brooks held any water right it was an exempt right with a priority date in 2005 when he claimed they began using water at their new home; and the only water right granted to Kambich from Minerals Engineering was to the Section 8 Well.

¶20    Nelson testified that he worked at the Minerals Engineering mine from 1955-57 for surveying and grade control. He stated that the site used water from wells drilled on the site in addition to water from the Big Hole River. He described the site as containing a flotation mill, as well as a camp with a cookhouse and trailers where people lived. Dirk Nelson (Dirk) is an engineer who works for Apex. He prepared an exhibit showing the mining site boundaries as well as all the wells in the area. According to this map, there are eleven wells within, or close to, the mining permit area. Dirk testified that the 10

8

gpm flow of the Disputed Well would not be useful to the mine, and if Apex was granted the right to the well it would have to be cleaned out and redrilled in order to get 100 gpm. Dirk further testified that the mine is not concerned about the Brooks' use of 10 gpm. Rather, the mine's objection relates to liability concerns because the well and pumphouse are located within the mining project perimeter. The mine permit requires fencing and controls over access to the site. The first fence was constructed in 1994, and the current fence was built in 2007. At this time, Nelson put a gate in the fence for the Brooks to access the pumphouse.[5] The mine did not object to Tim Brooks' use of the well outside the project boundary, and similarly would not object to the Brooks' use of any well outside the project boundary.

¶21   The Water Master's report found that the claim belonged to the Brooks, and agreed with the DNRC that the amendments requested by the Brooks should be accepted, amending the place of use, the priority date, the type of right, and the flow rate, which in turn would allow for the removal of all issue remarks. The Master noted that the right did not include domestic use even though the Brooks "presented some evidence of domestic use" because they did not object to the purpose of use or otherwise request to add such use prior to the hearing. She also concluded that, though Nelson had presented some "valid questions regarding the history of the well," he had failed to overcome the prima facie proof in the Statement of Claim as required by § 85-2-227, MCA.

---

[5] In 2009, Apex allegedly laid barbed wire across the right-of-way to the well. The Brooks travelled to the pumphouse relatively frequently to turn it on and off, and Randall Brooks tripped over the wire, fell, and broke his shoulder. He retained counsel in his claim against Apex for this incident, but the outcome is not explained in the record before us.

¶22 Nelson objected to several elements of the Water Master's report. The Water Court agreed with Nelson's argument that the Indenture did not convey the Disputed Well to Kambich, thus finding the Water Master's determination that the Indenture referred to the Disputed Well to be clearly erroneous. To support this, the court stated that the Indenture mentioned the Section 8 Well, rather than one in Section 5.[6] Thus, the Water Court concluded that the amended priority date of June 15, 1953, was unsupported by the evidence and reverted the date back to January 1, 1954, the date on the Statement of Claim. Nonetheless, the court concluded that though the Indenture did not convey title to the Disputed Well to Kambich, this did not affect the Brooks' ownership of the water right because Nelson had failed to meet his burden in contesting the prima facie evidence of the filed claim. The court further found that the "slight discrepancy" in the legal descriptions for the well and the right-of-way were not determinative of ownership.

¶23 The Water Court also agreed with Nelson's objection regarding place of use, concluding that no evidence supported pre-1973 use at the third place of use (the Brooks' new home) when the Brooks admit that water was first used in this location in 1993. The court noted that any changes to a water right made after July 1, 1973, are regulated by § 85-2-402, MCA. It recognized that not allowing the change to place of use may subject

---

[6] We note that the Water Court appears to have misread the Indenture on this point as the document does not mention a location by Section number, but rather notes a numbered mining claim site. Other evidence in the record suggests that the Section 8 Well could not exist in this location. However, as the Brooks did not cross-appeal on this issue, we will not consider it further.

the Brooks to hardship, but the only remedy for them was to file the proper change application with the DNRC.

¶24 The court rejected all other objections by Nelson. Specifically, the court determined that the claims granted to him in the prior case were "not for the well involved in this Case." It also determined that acceptance of the significantly reduced flow rate, from 100 gpm to 10 gpm, is generally beneficial to all water users and such requests to reduce water rights are routinely granted. It further determined that the Water Master's decision to amend the type of right to "use" rather than "filed" was "harmless error if it were error at all" because a decree issued by the Water Court is not required to distinguish the type of right, citing § 85-2-234(6), MCA. Thus, the court determined that it need not consider what type of right the Brooks had, as established by the evidence.

¶25 The Brooks also objected to the Master's report, and requested that domestic use be added. The court accepted this argument, noting that purpose of use was originally published as an issue for resolution based on an objection, later withdrawn, by GE. Because there was evidence of pre-1973 domestic use, the Water Court added this as an additional purpose of use for the claim.

¶26 Nelson appeals from the Water Court's decision. He argues that it was not harmless error to allow a "use" right to be declared in place of a "filed" right; the Brooks' claim should have been terminated after finding the Indenture did not convey the Disputed Well; the Statement of Claim was repudiated by the Brooks' attempt to amend the Statement of Claim, and thus the Brooks were not entitled to the prima facie proof

11

statute; there was no evidence of beneficial use by the Brooks, and no evidence of domestic use; and finally, that he is the owner of the well and the associated water right by virtue of being the successor for the mining claim and the rights granted to him in case 41D-167.

## STANDARD OF REVIEW

¶27     As this case involves both a Water Master and the Water Court, two standards of review are applicable.  "[T]he Water Court reviews the Water Master's findings of fact for clear error and the Water Master's conclusions of law for correctness."  *Heavirland v. State*, 2013 MT 313, ¶ 14, 372 Mont. 300, 311 P.3d 813; *see also* W. R. Adj. R. 23.

¶28     We apply the same standard of review to the Water Court as we do to an appeal from district court.  *Heavirland*, ¶ 15 (citing *Mont. Trout Unlimited v. Beaverhead Water Co.*, 2011 MT 151, ¶ 16, 361 Mont. 77, 255 P.3d 179).  Whether the standard of review was correctly applied is a question of law, which we review for correctness.  *Heavirland*, ¶ 15.  Thus, we review the Water Court's order de novo to determine whether it correctly applied the clear error standard of review to the Water Master's findings of fact, and whether its conclusions of law are correct.  *Heavirland*, ¶ 15.

## DISCUSSION

¶29     *1. Did Nelson have a previously adjudicated right to the Disputed Well?*

¶30     Nelson repeatedly asserts that he has a prior adjudicated right to the Disputed Well.  Nelson bases this claim on the fact that case 41D-167 granted him the right to use two wells in Section 5 for a cumulative total of 100 gpm.  The Brooks did not object to

that proceeding or in any other way dispute Nelson's claim to such use. Additionally, Nelson alleges that the DNRC determined the three claims were for the same water right through the issue remarks on the abstracts indicating that all three claims appeared to be for the same historical appropriation based on the similarity in priority dates and points of diversion.

¶31 Rather than raising it as an issue, Nelson presents this as a given fact and characterizes each issue as whether the Water Court appropriately granted the Brooks a senior claim to a previously adjudicated well when they failed to object to the prior adjudication. However, the Water Court held that Nelson's claims as adjudicated in the prior case were "not for the same well involved in this Case." The two wells granted to Nelson in the previous adjudication are both located in the *south half* of the southeast quarter of the southeast quarter of Section 5. The Disputed Well is in the *northwest quarter* of the southeast quarter of the southeast quarter of Section 5. Given the numerous wells in this small area (with three in the south half alone), there is no evidence to suggest that the Disputed Well was one of the wells previously granted to Nelson. Additionally, Nelson admitted that Apex has never used the Disputed Well, and that the Brooks' use of the well does not interfere with Apex's use of water. As no argument is presented on why the Water Court was incorrect in finding that the two wells from the prior adjudication were not the same as the Disputed Well, there is no reason to reverse such a finding. Thus, the issues in this case are appropriately framed as Nelson objecting to the Brooks' claim to an unadjudicated well.

13

¶32    *2. Did the motion to amend the Statement of Claim by the Brooks repudiate the originally filed claim?*

¶33    Similar to the previous issue, Nelson claims as fact that the Brooks repudiated the Statement of Claim filed in 1982 by filing a motion to amend the claim's priority date, place of use, and amount of use. He then points to this alleged repudiation as placing the burden of proof on the Brooks to establish their claim, apparently as a new and distinct claim rather than an amendment to the earlier filed claim. However, again, Nelson failed to present argument on why the filing of such a motion is a repudiation of the original claim. At most, the Brooks sought to amend certain elements of the filed claim. Nothing in the record indicates they abandoned use of the claim, transferred the claim, or in any other respect repudiated their right to the claim.

¶34    The effect of a motion to amend a statement of claim is simply that it is judged against the original claim to determine if sufficient evidence supports the requested amendment. W. R. Adj. R. 19 states that the original filed claim is prima facie proof of the elements of the claim, and *even a claimant's objection to her own claim* must be proven by a preponderance of the evidence to overcome this prima facie proof. In *Weinheimer Ranch, Inc. v. Pospisil*, 2013 MT 87, 369 Mont. 419, 299 P.3d 327, claimants filed a motion with the Water Court to amend their previously filed claim's priority date. The Water Court denied the motion, finding that there was insufficient evidence to support the new date. We affirmed. *Weinheimer Ranch*, ¶ 1. The Water Master, and ultimately the Water Court, had to evaluate the motion to amend against the

14

original claim to determine whether the amendment could be made. Rather than holding that the motion to amend repudiated or terminated the previously filed claim or subjected the claimant to having to prove the original priority date once the amended date was rejected, we held that the originally filed claim was considered prima facie proof of its contents, and the claimants had the burden to prove the requested amendment (against their own earlier claim) by a preponderance of the evidence. *Weinheimer Ranch*, ¶ 28. Since the claimant couldn't prove the amendment with sufficient proof, the originally claimed priority date remained in effect.

¶35 Here, the Brooks' motion to amend did not repudiate the filed claim and require them to prove a new claim. Rather, the 1982 claim correctly remained prima facie proof of the elements, which required proof by a preponderance of the evidence by the Brooks to be amended.

¶36 *3. Did the Water Court err by relying on the Brooks' filed Statement of Claim as prima facie proof of the water right?*

¶37 Section 85-2-227(1), MCA, states "a claim of an existing right . . . constitutes prima facie proof of its content until the issuance of a final decree." Thus, an objector has the burden to prove by a preponderance of the evidence that the elements of the original claim "do not accurately reflect the beneficial use of the water right as it existed prior to July 1, 1973." W. R. Adj. R. 19. As explained above, the rules and our prior precedent are clear that a motion to amend a statement of claim is not treated as a repudiation of the original claim. Just as the motion to amend needed to be proven by a

15

preponderance of the evidence to overcome the prima facie proof of the original claim, Nelson's objections to the claim were correctly held to the same standard.

¶38 Nelson presented evidence that there were several wells in the area, including another well in a different Section that was used by both the Brooks' predecessor in interest and Minerals Engineering. However, he presented no evidence to suggest that Kambich was not using the Disputed Well, as the Statement of Claim states. He does not claim to have used the water himself, or even know of who was using it. Rather, he relies on the inference that since the mine was operating until 1976, it stands to reason that Minerals Engineering was using it until this time and that the Brooks "began squatting on [the Disputed Well] in 1990 when the mine was dormant." The court correctly concluded that such inferences are not sufficient to overcome the prima facie proof of the filed Statement of Claim for the Disputed Well.

¶39 *4. Did the Water Court err in concluding that it need not consider whether the Brooks' claimed right was a "use" right or "filed" right?*

¶40 According to the Water Court Claim Examination Rules, a "use right" is defined as putting water to beneficial use "without written notice, filing, or decree." W.R.C.E.R. 2(a)(71). A "filed right" is a right "which has been filed and recorded in the office of the county clerk and recorder as provided by statute prior to July 1, 1973." W.R.C.E.R. 2(a)(25). Though a final decree is not required to have the type of right identified, § 85-2-234(6), MCA, Nelson points to the examination rules which require the summary report of a claimed right (the abstract) to identify the type of right.

16

W.R.C.E.R. 5(a)(1)(vi). However, the examination rules are only applicable to the DNRC for examining claimed rights prior to issuance of a decree. W.R.C.E.R. 1(b). The Water Right Adjudication Rules contain no similar provision requiring the Water Master or Water Court to consider the appropriate type of right during adjudication. Ultimately the Water Court declined to consider Nelson's objection to the type of right, concluding that even if a "use" right was incorrect, the error was harmless.

¶41 This Court will not disturb the ruling of a lower court if the error does not affect a party's substantial rights. *Renner v. Nemitz*, 2001 MT 202, ¶ 28, 306 Mont. 292, 33 P.3d 255; M. R. Civ. P. 61. We have previously determined that harmless error analysis is appropriate when evaluating whether the fixing of an arbitrary appropriation date for a water right was reversible error. *Vidal v. Kensler*, 100 Mont. 592, 594, 51 P.2d 235, 236 (1935). In *Vidal*, we held that as the appropriation date is only material in a question of priority, fixing an incorrect date is "harmless unless the objecting claimant can show that his right antedates the date fixed for another" claim. *Vidal*, 100 Mont. at 594, 51 P.2d at 236.

¶42 In the present case, it is unclear what effect, if any, the type of right has on either party. It is possible that under different facts the type of right may have a bearing on priority or other rights of the parties, but in the present case the type of right is immaterial. Both types require proof of beneficial use, which is the primary requirement for any water right. The amount of use, priority date of use, and purpose of use are not related to the type of right. The Brooks are the only individuals with a valid claim to the

17

Disputed Well under the Water Court's order. Whether that right is determined to be a "use" right or a "filed" right will not change Nelson's position with respect to the well, or otherwise impact any other water rights he may have. Thus, we agree with the Water Court that even if declaring the right to be a use right was error, that error was harmless and will not be disturbed.

¶43     *5. Did the Water Court err in concluding that sufficient evidence existed to amend the Brooks' purpose of use to include domestic use?*

¶44     The Water Master did not make a finding of fact that domestic use was not proven. Rather, she made a conclusion of law that despite there being "some evidence regarding domestic use," such use would not be considered as the Brooks had not timely requested to add it. Nelson argues that the Brooks never claimed a domestic use or objected to the purpose of use, nor was there any evidence of such use prior to 1973. Though the Brooks did not originally claim domestic use through an objection to their own claim prior to hearing, the transcript reveals that domestic use was discussed throughout by all parties. The Brooks disputed the Master's report regarding the lack of domestic use through a letter to the Water Court. The Water Court determined to treat their post-hearing request to add domestic use as an objection because it was filed before the deadline for objections to the Water Master's report, and the purpose of use was properly notified as an issue to be determined based on earlier objections. Nelson did not present any authority as to why the Water Court's treatment of the request as an objection was impermissible, so we will not consider that decision.

18

¶45 As to the sufficiency of the evidence, Nelson's own briefing admits that evidence of domestic use prior to 1973 was established. His brief identifies as an uncontroverted fact that "Nelson testified that the Disputed Well was used for mining operations including the *domestic needs* of employees at the site [from 1955 to 1957]." (Emphasis added.) Nelson, having worked at the site during that time, explained that the area contained a camp where miners lived. Randall testified that it was his understanding from Kambich that the Disputed Well supplied the mining camp as it was the only well that provided potable water. He also explained that pipes still lead from the well to the foundations where the old bathrooms, showers, and kitchens used to be. The 1963 Declaration of Vested Rights for the Disputed Well further identifies the beneficial use to be "primarily domestic water." Thus, there was evidence of pre-1973 domestic use of the water. From this evidence, we cannot conclude that the finding of domestic use by the Water Court was clearly erroneous.

¶46 *6. Did the Water Court err in concluding that ownership of the point of diversion for the claim was not dispositive of the ownership of the water right?*

¶47 Nelson claims the Water Court incorrectly disregarded the evidence it produced as to Apex's ownership of the mining claim where the Disputed Well is situated. Nelson alleges that as the successor in interest to Minerals Engineering's mining claims, it can be inferred that Apex is also the owner of the well itself. Nelson also points to the Brooks' failure to present any chain of title evidence establishing their ownership of the well, other than the 1953 Indenture which the Water Court concluded covered a different well.

19

This failure, it is argued, establishes that Nelson is the only possible owner of the Disputed Well and its related water use.

¶48   A water right is an usufructory right, that is a right to make use of the water, rather than a physical ownership right. *Mont. Trout Unlimited*, ¶¶ 31-32 (citing Albert W. Stone, *Montana Water Law*, 70, 73 (St. Bar of Mont. 1994)). We long ago stated that "the ownership of land where water has its source does not necessarily give exclusive right to such waters so as to prevent others from acquiring rights therein." *Woodward v. Perkins*, 116 Mont. 46, 53, 147 P.2d 1016, 1019 (1944). Thus, like the Water Court, we conclude that Nelson's claim of ownership of the mining claim where the Disputed Well is situated is not dispositive of the issue of ownership of the water right to use the Disputed Well. Nelson had the burden to prove that the 1982 Statement of Claim did not accurately describe the *use of water* from the Disputed Well prior to 1973. The ownership of the mining claim itself is not determinative of such use.

## CONCLUSION

¶49   As the Water Court concluded, "Nelson may wish [the] Brooks' well were elsewhere, but that desire does not translate into proof that [the] Brooks' well claim is invalid." Nelson failed to meet his burden in proving that the Brooks' claimed use of the Disputed Well did not accurately reflect the use as it existed prior to 1973. We affirm the Water Court's order.

/S/ PATRICIA COTTER

20

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ LAURIE McKINNON